## Ex Parte James Savage.

No. 1084. Decided October 18, 1911.

Rehearing denied December 13, 1911.

### 1.—City Charter and Ordinances—Billboard—Constitutional Law.

Where a special city charter empowered the city authorities to regulate the business of bill posting and bill boards, etc., such city could regulate by ordinance the erection and maintenance of bill boards and such other structures as are used for posting advertising matter, and prevent the erection, construction or maintenance of any other except as authorized in said ordinances, and require persons before pursuing such business to procure proper license.

### 2.—Same—Monopoly—Antitrust Law.

Where relator sought release from arrest under a city ordinance with reference to posting advertisements, etc., it was not necessary to decide whether such ordinance created a monopoly, but the antitrust laws of Texas have no application to any of the questions raised.

### 3.—Same—Office—Bill Poster.

A city charter which gives the city, under a special Act of the Legislature, power to regulate the location of bill boards and bill posting and the distribution of circulars or other advertising matter, and to prescribe penalties for the violation of same, gave the city no power thereunder to create the office of bill poster, let the office to the highest bidder and then prohibit any other person from following the business; when construed in the light of other provisions in said charter.

From Lamar County.

Original habeas corpus proceedings asking release from arrest under a city ordinance with reference to billboards and billposting.

The opinion states the case.

*Wright & Patrick,* for respondent.—On the question of the city's power to create the office of billposter: State v. Milwaukee, 140 Wis., 38; Ritz v. Lightson, 103 Pac., 363; Tuszkenicz v. Luther, (R. I.), 76 A. 829; Nashville v. Linck, 80 Tenn., 499; Hill v. St. Louis, (Mo.), 60 S. W., 116; Harrison v. Baltimore, 1 Gill (Md.), 264; Gunning v. City of St. Louis, 137 S. W. Rep., 929, 28 Cyc., of Law, pp. 744 and 692; Cronein v. People, 82 N. Y., 318; Ex parte Byrd, 84 Ala., 17; People v. Pratt, 129 N. Y., 69; Attorney-General v. Boston, 142 Mass., 200; City of San Antonio v. Micklejohn, 33 S. W. Rep., 735; Ernst v. City of Springfield, 130 S. W. Rep., 419; Potter v. Bell, 101 S. W. Rep., 297.

*C. E. Lane,* Assistant Attorney-General, for the State.

*Edwards & Edwards,* for relator.—On question of monopoly: McDonald v. I. & G. N. Ry., 60 Texas, 590; Galveston Co. v. Heidenheimer, 63 Texas, 559; City of Brenham v. The Brenham Water Co., 67 Texas, 542; Altgelt v. San Antonio Water Works, 81 Texas, 436; Austin v. Nalle, 85 Texas, 520; Edwards Co. v. Jennings, 89 Texas, 618; Jackson v. State, 117 S. W. Rep., 818; Butcher's Union Slaughter House v. Crescent City, 111 U. S., 716; People ex rel. v. Murphy, 195 N. Y.,

126; Curran Bill Posting Co., etc., v. City of Denver, 47 Col., 221; Com. v. Hopper, 22 Mass., 42.

PRENDERGAST, JUDGE.—On January 30, 1911, a complaint was filed in the Corporation Court of the city of Paris, Texas, charging that the relator did on that date unlawfully post and cause to be posted on a billboard situated on the west side of South Main Street within the corporate limits of said city, circulars, handbills, posters and advertisements, he, at the time, not being city billposter or one of his deputies or acting as such. Upon this complaint a warrant for his arrest was issued and the city marshal of Paris arrested him and held him in custody thereunder. On the same date he sued out a writ of habeas corpus before Judge Harper of this court which was granted and the cause set for hearing before this court. The cause was submitted sometime ago by both oral and written arguments and briefs.

On March 15, 1905, the Legislature of this State passed an Act incorporating the city of Paris by special charter. By one of its provisions the courts are required to take judicial notice thereof. It is unnecessary to cite but few of the provisions of this charter as only a few of them are applicable to the questions at issue. Sections 6, 7, 8, 9, and 10 are as follows:

Sec. 6. "Said corporation of the city of Paris may pass and establish such acts, laws, rules, regulations and ordinances not inconsistent with the Constitution of this State, as shall be advisable or needful for the government, interest, welfare, sanitation, health and general good of said corporation and of the inhabitants thereof." . . .

Sec. 7. "The municipal government of the city of Paris shall consist of the City Council, which shall be composed of five aldermen and the Mayor."

Sec. 8. "The other officers of said city shall be a recorder, city marshal, city attorney, city secretary, an assessor and collector, city treasurer, and such other officers and employees as the City Council may determine."

Sec. 9. "The recorder, city marshal, city attorney, city secretary, city assessor and collector, shall be elected by vote of the people, and shall hold their offices for a term of two years and until their successors are elected and qualified except as herein provided. The compensation of said officers shall be fixed by the City Council."

Sec. 10. "All other officers and employees of the city, except treasurer, which is otherwise herein provided for, shall be appointed by the mayor and confirmed by the council, and shall perform such duties, and receive such compensation as may be decided upon by the council, and shall not be appointed at any one time for a longer term than one year, and such officers and employees may be removed either by the mayor or by the council at any time, upon the payment of salary or salaries to the time of discharge."

Section 36, which it is unnecessary to copy, provides in substance

that the council shall select for treasurer the person who will pay the highest interest on the daily balances of the city funds and who shall be the highest and best bidder therefor. It requires him to give bond and pay out the funds in accordance with law and has other provisions relating thereto, such as are usual in the various charters of the cities of Texas on this subject. There are other sections giving the city control over streets, alleys and public places and specifically authorizing it to fix and regulate public carriers, hacks, hauling and draying, the speed of engines, the erection of market houses, markets and market places, which are usually given in such charters.

The only provision which we have found or which has been called to our attention on the subject of giving to the city the power to regulate billboards and billposting is section 191, as follows: "To regulate the location of billboards and billposting and the distribution of circulars or other advertising matter and to prescribe penalties for a violation of same."

On January 10, 1910, by virtue of the said provisions of the charter the city of Paris passed an ordinance the title of which is: "An ordinance regulating billposting and the size and location of billboards within the city of Paris, and providing a penalty for violation." Thereby and by amendments of September 7, 1910, and January 2, 1911, it created the office of billposter with the term of office limited to one year and provided that the mayor should advertise for sealed bids to be submitted by persons wishing to become such officer and required the mayor to nominate and authorize the council to confirm any such person who submitted the highest and best bid for the office; required such person, when elected, to give a bond to the city in the sum of five hundred dollars, conditioned for the faithful performance of his duties and the observance of the law by himself and his deputies, and authorizing him to appoint six deputies. Section 4 made it an offense for any person other than this officer or one of his deputies "to post or cause to be posted, or tacked or fixed on any billboard, building or other place within the corporate limits of the city any circular, billposter or other advertisement whatsoever;" prohibited any billboard, building, wall, fence or other structure situated within five feet of the edge of any sidewalk or street from being used for the purpose of posting, tacking or fixing thereon any advertisement, circular, handbill, poster or advertisement of any character whatever. Prohibited this officer and his deputies, by posting any of this advertising matter, to obstruct any portion of the street or sidewalk adjacent, but required that such street, alley or sidewalk should at all times be open for free and uninterrupted use by the public; required all such billboards and other structures for posting these advertisements securely fixed in the gound by braces or other means so as to be perfectly stable. Prohibited them from being over twelve feet high, but required they should be adequate for the service expected and from being used until approved and inspected by the chief of police. That there should

be an open space of at least three feet between the lower edge and the ground of every billboard which should not be closed in any manner and that such billboard should not be placed nearer than five feet of any building or to the side line of any building, sidewalk, street or other billboard. Required the said officer and his deputies to make frequent examinations of the billboards and other structures used for that purpose and prevent the same or any portion from falling on the ground or getting on the sidewalk or street, and requiring them to tear off and clean such boards and prevent them from presenting an unsightly appearance.

There are other sections of the ordinance and amendments which required the billposter to file sworn written reports with the city secretary, showing the size and location of all billboards and other structures intended to be used by him and all such new structures as were thereafter erected by him, giving the cost and material of such billboards and structures and other data thereabouts, so as to give the exact cost and worth thereof. Also in effect requiring that in taking leases from private persons for any of their property for use in the business so as to make them assignable to his successor, providing for a committee of disinterested persons to value all such property in the event another shall succeed, and requiring him to transfer all leases and property used by him for that purpose to his successor and if his successor refused to take them, he shall have the privilege of removing all of his property. It is unnecessary to give further details of this feature of the ordinance and amendments. The ordinance, however, also prohibited him from posting any advertisement, etc., which should be disapproved by the mayor or chief of police and provided that for any violation of the provisions of the ordinance such person should be guilty of a misdemeanor and fined in any sum, not less than one nor more than one hundred dollars. The ordinance also regulated the maximum charges the officer could make for posting the advertisements, etc.

There is no statement of facts in the record. From it, we take it, no evidence was introduced. The relator evidently contests the validity of the ordinance and amendments thereto solely on the face of them. They are copied into and made a part of his application for the writ of habeas corpus. Under such circumstances in the well considered opinion of this court in the case of Ex parte Gregory, 20 Texas Crim. App., 222, this rule is laid down: "When the question as to the reasonableness of a municipal by-law or city ordinance is raised and it has reference to a subject matter within the corporate jurisdiction, it will be presumed to be reasonable, unless the contrary appears on the face of the law itself or is established by proper evidence. See, also, St. Louis Gunning Ad. Co. v. City of St. Louis, 137 S. W. Rep., 962.

Relator contends that said ordinance and amendments are unconstitutional, unreasonable, unauthorized and void.

Under this general attack, among others, the relator claims: 1. That it is contrary to article 1, section 26, of the Constitution, which is, "that perpetuities and monopolies are contrary to the genius of free government and shall never be allowed." 2. That it is in direct conflict with the anti-trust law of the State. 3. That the city has no power to enact such an ordinance, and 4. In effect, that it would destroy the legitimate business of others and prevent them from following the lawful pursuit of such business and the city would thereby undertake for itself to go into a business not authorized or permitted by law.

There are many other objections by relator to various particular provisions of the ordinance. We shall not undertake, as we deem it unnecessary, to give or discuss them. What we have said above is sufficient statement of the case to show the points discussed and decided herein.

The tendency of legislation in this State now is to require the counties, cities and school districts—all municipal corporations—to elect such person treasurer as will pay to the respective municipal corporations interest on the funds they handle and keep in custody. It is unnecessary to specifically cite this legislation as it is known of all and seems to be now the policy of the State. Such legislation requiring the appointment, under certain conditions, of pilots for the State and prohibiting any other than such legally appointed pilots to follow the business or engage therein, is sustained by the courts (Peterson v. Board, 24 Texas Crim. App., 33, 57 S. W. Rep., 1002; Olson v. Smith, 68 S. W. Rep., 320, which case was appealed to and sustained by the Supreme Court of the United State, 195 U. S., 332), even though, by this, competent pilots who have been engaged in the business before are thereby prohibited and prevented from following such business and making a living therein.

Again, this State has by legislative Acts provided for the appointment by the governor of public weighers for the large cities, and authorized the Commissioners' Court to provide in some cities and smaller towns, for the election of public weighers for such cities and towns, and prohibit any other than such officers from pursuing that business, and the courts of this State have uniformly sustained such legislation, even though others had followed the business and were competent and able to engage therein and had earned and were then earning a living from such legitimate business. Davidson v. Saddler, 23 Texas Crim. App., 600, 57 S. W. Rep., 54; Johnson v. Martin, 75 Texas, 33.

This court has sustained the Act of the Legislature of this State making it a penal offense for any other than the agent of a railroad company to sell passengers tickets, (Jannin v. State, 42 Texas Crim. Rep., 631) and an ordinance of the city of San Antonio to the same effect, even though persons had theretofore engaged legitimately in the business and had earned and made a living thereby. (Ex parte Hughes,

50 Texas Crim. Rep., 614, 100 S. W. Rep., 160). It seems from all of this that such legislation, by the State, or by the cities which are expressly given full power and authority in such cases, is not unconstitutional. We think it may be taken as well established too, that wherever the State has, or any of its municipalities which have by the legislation been expressly given the power and authority, have created and established an office and an officer therefor to do certain things, and prohibited others from doing such things, that while such office may create in a manner a monopoly for whatever is to be done by and through such officer, that the constitutional provision prohibiting monopolies, above cited, has no application whatever; for the position and duties of every officer in a general sense is a monopoly with reference to his powers and duties. No one else can discharge the duties, or is authorized to perform the service, or can receive the pay therfor.

We think it unquestionable that under the authority and the power given to the city of Paris in the provisions of the charter we have cited above,—sections 6 and 191,—the city had power and authority to regulate the business of billposting and the billboards and other structures and places used for posting bills in substantially the way that such matter was regulated by this ordinance. One of the best considered cases that we have found in investigating this case and questions arising therein, is St. Louis Gunning Advertising Company v. City of St. Louis, 137 S. W. Rep., 929. In this case the Supreme Court of Missouri reviewed a great many of the decisions on the subject. The able and clear opinion in that case was evidently prepared so that the questions therein decided could be reviewed by the Supreme Court of the United States, to which court the case has been appealed. We quote with approval some of that opinion with reference to the character of the business of billposting and regulations of the billboards and other structures and places used for advertising and the character of advertising which can be placed thereon, which the court can look to, especially when no evidence was introduced as in this case, as follows:

"Speaking generally, plaintiff's business consists of outdoor advertising, displayed at conspicuous points and places by means of pictures, signs, and letters. The more conspicuous and public the place the greater is the desire to cover it with that class of advertisements. The privacy of the home, places of public resort, retreats for rest and recreation, seats of learning and even the sanctity of the church are as much within the shadow of the structures hereinafter described as are the vacant lots and commanding views along the public thoroughfares of the city. The walls and roofs of many residences and business houses are not exempt from this intrusion. While all kinds of business and merchandise are advertised by this means of display, yet observation and common experience teach us that probably the greater percent thereof proclaim the newest and choicest brands of liquors, tobacco, cigars and cigarettes, and announcements of various plays which are

to be presented at the various theatres. These, however, are interspersed with information regarding the comforts and necessities of life. These billboards are temporary affairs, consisting of upright timbers, or posts, set in the ground at various distances from each other, braced from the rear, with stringers running fom one to the other and there secured by means of nails or bolts. These stringers are then covered with boards standing on ends and nailed thereto, and thereby presenting a smooth vertical surface upon which the various announcements are made or displayed. In this general statement, we might also add that there is but one virtue connected with this entire business, and that is the advertising itself. This is a legitimate and honorable business, if honorably and legitimately conducted; but every other feature and incident thereto have evil tendencies, and should for that reason be strictly regulated and controlled. The signboards and billboards upon which this class of advertisements are displayed are constant menaces to the public safety and welfare of the city; they endanger the public health, promote immorality, constitute hiding places and retreats for criminals and all classes of miscreants. They are also inartistic and unsightly. In cases of fires, they often cause their spread and constitute barriers against their extinction; and in cases of high wind, their temporary character, frail structue and boad surface, render them liable to be blown down and to fall upon and injure those who may happen to be in their vicinity. The evidence shows and common observation teaches us that the ground in the rear thereof is being constantly used as privies and dumping ground for all kinds of waste and deleterious matters, and thereby creating public nuisances and jeopardizing public health; the evidence also shows that behind these obstructions the lowest form of prostitution and other acts of immorality are frequently carried on, almost under public gaze; they offer shelter and concealment for the criminal while lying in wait for his victim; and last, but not least, they obstruct the light, sunshine and air, which are so conducive to health and comfort. House signs and sky signs are similar to billboards, and are used for the same purposes, except they are attached to the walls of buildings or are constructed upon the roofs thereof. They endanger the public safety only in being liable to be blown down and injure people in their fall. They also assist in the spread of fires and greatly interfere with their extinction. The amount of good contained in this class of this business is so small in comparison to the great and numerous evils incident thereto that it has caused me to wonder why some of the courts of the country have seen fit to go so far as they have in holding statutes and ordinances of this class void, which were only designed for the suppression of the evils incident thereto and not the suppression of the business itself. While advertising, as before stated, is a legitimate and honorable business, yet the evils incident to this class of advertising are more numerous and base in character than are those incident to numerous other businesses which are con-

sidered mala in se; and which for that reason may not only be regulated and controlled, but which may be entirely suppressed for the public good under the police power of the State. My individual opinion is that this class of advertising as now conducted is not only subject to control and regulation by the police power of the State, but that it might be entirely suppressed by statute, and that, too, without offending against either the State or Federal Consitution."

And again: "Common observation and experience teach us that generally when such structures are blown down the upright posts supporting them only partially break, near the ground, thereby permitting the entire structure to fall prone upon the ground, with the lower parts scarcely displaced from their natural position, while the top parts thereof reach out upon the ground the full number of feet that the boards are high. If they are fourteen feet in height, as the ordinance permits them to be, then in falling they would fall upon and injure any one who should be passing along the street within fourteen feet of the base line of such billboards. From this it must be seen that the city wisely forbade the erection of such boards nearer than six feet to the side line of lots fronting upon the street, and nearer than fifteen feet to the front line thereof. The ordinance would have been wiser and better if it would have prohibited all such structures from being erected nearer than fifteen feet to the line of any street, avenue or any other public thoroughfare.

"Not only this, but the record also shows that the ground in the rear of all such billboards is thereby practically converted into and is constantly being used as privies and general dumping grounds for all kinds of rubbish and filth. The grass and weeds which grow back of these billboards can not be cut or destroyed on account of the posts and braces extending back from the rear thereof, as shown by the picture marked 'Behind the Scene.' And these billboards, like snowsheds, cause a suction behind them, and when the wind blows against their fronts it gathers up papers and all kinds of trash and combustible material and deposits them in the rear thereof, which are securely retained there by the growing grass and weeds until the fall of the year, when the frost and snow kills the grass and weeds, which in the course of a little time become dry and highly combustible. Under that condition we see hundreds, and perhaps thousands, of these billboards, with their solid walls and rear supports, extending from a few feet up to twenty-five or thirty in height, and possibly more, composed of boards and timbers dry as tinder, covered with paint and paper posters, and packed in behind with dry grass, weeds, paper and other combustible materials, which have been growing and accumulating for months, thereby creating hundreds of menacing conditions throughout the city, which may at any moment be ignited by a spark from a nearby chimney, a lighted match in the hands of some thoughtless child, or by a stump of a burning cigar, tossed aside by some careless hand. By looking at the pictures before mentioned, it will be readily

seen that a fire thus started would grow and spread in no mean proportions; and in case of high wind, the results thereof might in all probability, result very seriously in the destruction of property and disastrously to human life.

"Even in the absence of evidence, common sense tells us that an opening of three or four feet between the ground and lower ends of such billboards, with openings in them at given distances, and spaces between each other and between them and nearby buildings, would greatly retard the spread of the fire and materially aid in checking its progress. It is also in keeping with common knowledge that the natural tendency of all such structures is to create and maintain just such nuisances as the record in this case shows these billboards have done in this case. Their ordinary and natural condition and tendencies are nuisances in character, if I may so coin that word.

"In answer to these suggestions, counsel for plaintiff argue that the same nuisances might be committed behind fences and in buildings. While that is possible, yet it is not probable; nor does the erection and maintenance of a building or a fence along the lines of private property bordering upon public streets have the natural tendency to create any such nuisances as those mentioned. Buildings and fences are erected for the purpose of inclosing grounds and excluding therefrom strangers and trespassers; and common experience teaches us that they are effectual for that purpose, which is inconsistent with the idea that they promote and harbor nuisances, as billboards do, which rarely, if ever, inclose the grounds upon which they stand. That is not the purpose of their erection. Generally they are built along only one end or side of a lot or plot of ground, but occasionally upon two sides, and in rare instances upon three, but I have never seen or heard of a lot being inclosed upon all four sides by billboards. The end of the lot fronting upon an alley is almost invariably left open for the simple reason that the alley is not conspicuous in the public eye, and for that reason it would be useless to display advertisements at such places where they could not be seen. The nearer the lot of ground is inclosed by such structures, provided there is a sufficient opening for ingress and egress, the greater will be the nuisances committed behind them, and the more dangerous they become to public health and safety.

"If under the Constitution and laws of this State and nation, the plaintiff is exempt from the operation of all statutes and ordinances of the character here under consideration, and may, in defiance of them, erect and maintain structures of this character, the inducing cause and natural abiding place for filth, disease, and noxious odors, then the same constitutional provisions and laws would warrant plaintiff in erecting counterparts to its now existing billboards, only a few feet removed therefrom, close up the ends, cover the space thus inclosed, construct stools therein, and place a door or opening every few feet in the front or rear wall thereof. Plaintiff might also leave them unguarded as now and use the entire structure for advertising

purposes, and public privies. The difference between the two classes of structures and nuisances which would follow would be one of degree and not of principle. The latter class of structures perhaps would induce a large number of persons to commit the abominable nuisances which are now being committed behind the former, yet they are no more objectionable in the one case than they would be in the other, barring, of course, the degree or extent thereof. The greater the degree or extent of the nuisance the greater are the offensive odors issuing therefrom, and the more likely are they to create sickness and disease. But neither should be tolerated for a moment. Decency and good morals no less than the health and general welfare of the city imperatively demand their suppression; and if, as the evidence in the cause shows and as common knowledge and observation teach us, they can not be abated in any other way than by regulating and controlling the structures which invite and induce their commission, then the police power of the State is ample to warrant that control and regulation without infringing upon any contitutional rights of plaintiff. This was the view taken by the Supreme Court of the United States in the case of Mugler v. Kansas, 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205. That case involved the constitutionality of the constitutional amendment of that State, prohibiting the manufacture and sale in that State of any and all intoxicating wines and liquors. The point was there made that it was not the manufacture and sale of the liquor which caused the evils the amendment was designed to cure, but that it was the excessive use thereof that caused the evils and harmful conditions that existed in that State, and for that reason it was in effect insisted that the business of manufacturing and selling intoxicating liquors was not a nuisance per se. Predicated upon those contentions, plaintiff further insisted that its business could not be suppressed under the police power of the government, and for that reason said amendment was violative of the Constitution of the United States, in that it took his property for public use without just compensation. In the discussion of that proposition, Mr. Jusice Harlan, in a masterly opinion, in speaking for the court, said:

"'But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for

the protection of the public morals, the public health, or the public safety.' " . . .

Further on the question of the validity of such ordinance, see City of Rochester v. West, 164 N. Y., 510, 58 N. E., 673, 53 L. R. A., 548, 79 Am. St. Rep., 659; In re Wilshire, (C. C.), 103 Fed., 620; Gunning System v. Buffalo, 75 App. Div., 31, 77 N. Y. Supp., 987; Rideout v. Knox, 148 Mass., 368, 19 N. E., 390, 2 L. R. A., 81; Whitmier v. Buffalo (C. C.), 118 Fed., 773; City of Grand Rapids v. DeVries, 82 N. W., 269; Fischer v. St. Louis, 48 L. Ed., (U. S. Rep.), 1018; Davis v. Mass., 42 L. Ed., (U. S.), 71; Wilson v. Eureka City, 43 L. Ed., (U. S.), 605.

All of the authorities establish that the regulation of billboards and billposting are clearly within the police powers of the city. The charter of the city of Paris, in the broadest and most comprehensive terms, gives to it practically all police power in that it says "it may pass and establish such Acts, laws, rules, regulations and ordinances not inconsistent with the Constitution of this State as shall be advisable or needful for the government, interest, welfare, sanitation, health and general good of said corporation and the inhabitants thereof." And then, in addition thereto, specifically in section 191, gives it the power "to regulate the location of billboards and billposting and the distribution of circulars or other advertising matter and to prescribe penalties for violation of same." We believe that under this power and authority the city of Paris could substantially, as it does in this ordinance attacked, regulate the erection and maintenance of billboards and such other structures as are used for posting advertising matter, and prevent the erection, construction or maintenance of any others, except as authorized substantially in said ordinance, and require persons before pursuing such business to procure proper license therefor.

This court in the case of Anderson v. State, 53 Texas Crim. Rep., 243, has expressly held that under the charter of the city of Fort Worth, that city had the power to regulate the subject of the removal of stable manure, swill or other garbage and could prohibit any other than the garbage officer of said city removing night soil. This court, also, in the case of Ex parte Denny, 59 Texas Crim. Rep., 579, has held that the city of Paris, under the same charter, could properly regulate and require drivers of vehicles, hacks, carriages and other conveyances to procure a license and prohibit all not licensed, from following the business and could require the drivers, owners, etc., of such conveyances to remain at established stands when not engaged in actual transportation provided for by the ordinance. See, also, Brown v. Galveston, 97 Texas, 1; Ex parte Gregory, 20 Texas Crim. App., 210. The Supreme Court of the United States has also sustained such ordinance in Michigan and California where even municipalities had entered into contracts giving to certain persons the exclusive power and authority for a long number of years to remove garbage, night soil, etc.

Cal. R. Co. v. San Francisco R. W., 199 U. S., 306; Gardner v. Mich., 199 U. S., 325.

It is unnecessary for us to discuss the question of whether or not the ordinance in this case is such a monopoly as is contemplated by our Constitution in view of what we shall hereafter hold with reference to this ordinance. The anti-trust laws of this State have no application to any of the questions raised in this case. That the city has the power and authority to properly regulate billboards and other structures for billposting and the business of billposting itself, there can be no question.

That brings us to the only other question necessary to be decided, which is whether or not the city of Paris under the charter provisions hereinabove quoted, had the power to create the office of billposter, let the office to the highest bidder and then prohibit any other from following the business.

We do not undertake to say that the Legislature may not have the power and authority by express legislative enactment to give the municipal corporations of this State the power and authority specifically to create such an office, and give to such officer the exclusive right to follow the business, but what we do hold on this point is that under the present provisions of the charter of the city of Paris, it was not the intention of the Legislature to give to said city such power and authority. We think this is evident in view of the fact that the only express authority given to the city is "to regulate the location of billboards and billposting and the distribution of circulars or other advertising matter, and to prescribe penalties for the violation of same," notwithstanding that in the latter part of section 8, specifying the officers of the city it provides, "the city has the power to create such other officers as the city council may determine." We are confirmed further in this opinion in view of the fact that by this section 8 a treasurer is properly provided for as one of the officers; but by section 36 it is particularly required that the treasurer shall be such officer in effect as shall bid the highest rate of interest to be paid to the city for its funds. We believe that if the Legislature had intended by the general authority given to the city to create "such other officers as the council may determine," it had intended that the city should have the power to create the office of billposter and give him the exclusive authority to post bills because of his being the highest bidder for the office, that the Legislature would have expressly so stated. Having done so in the case of the treasurer, which office is expressly enumerated as one of the offices of the city, and regulated how and who should hold such office, we believe that if the Legislature had intended to give the city any such authority as to create the office of billposter and give him exclusively the right to post advertisements, it would have done so by express provision. The city did not have the implied power by reason of the provisions of the charter hereinabove noted. We, therefore, hold that the city of Paris did not have the

power and authority to create the office of billposter, let the office out to the highest bidder and thereby go into the business indirectly of billposting itself, and prohibit and exclude all others from following that business.

The prosecution against the relator is therefore ordered dismissed and the relator ordered to be discharged.

Davidson, Presiding Judge, absent.

*Discharged.*

[Rehearing denied December 13, 1911.—Reporter.]