PANTLIND *v.* CITY OF GRAND RAPIDS.

1. MUNICIPAL CORPORATIONS—ORDINANCES—GARBAGE.

    A refuse accumulation of animal, fruit, and vegetable matter attending the preparation, cooking, and use of food, including leavings from the table, although not mingled with liquid refuse, but rejected as unfit for human food, *held*, to be "garbage," under section 3 of an ordinance of the city of Grand Rapids providing for the regulation, collection, etc., of same.

2. SAME—GARBAGE—POLICE POWER — CONSTITUTIONAL LAW — PRIVATE PROPERTY.

    A city, in the exercise of its police power, has the right to treat garbage as a nuisance, and if in providing against same, the owner of such material suffers some slight loss, the inconvenience or loss is presumed to be compensated in the common benefit secured by regulation.

3. SAME—DUE PROCESS OF LAW.

    A city ordinance regulating and controlling the collection, conveyance, and disposal of garbage is not invalid on the ground that it takes private property without due process of law.

Appeal from superior court of Grand Rapids; Dunham (Major L.), J. Submitted January 8, 1920. (Docket No. 34.) Decided April 10, 1920.

Bill by J. Boyd Pantlind and others against the city of Grand Rapids to enjoin the enforcement of a garbage ordinance. From a decree for plaintiffs, defendant appeals. Reversed, and bill dismissed.

*Swarthout & Master* and *Frank I. Blake,* for plaintiffs.

*Charles A. Watt,* for defendant.

CLARK, J. We quote from an ordinance of the defendant city:

---

Authorities discussing the question of power of municipality over nuisance of garbage in street, are collated in notes in 6 L. R. A. (N. S.) 1013; 43 L. R. A. (N. S.) 1037, and L. R. A. 1915C, 747.

"An ordinance providing for the regulation, collection, removal and cremation of garbage, offal, dead animals and other refuse matter, and for the regulation of the crematory in the city of Grand Rapids."

"SEC. 2. It shall be unlawful for any person residing within the limits of the city of Grand Rapids or elsewhere to deposit, throw or place any garbage, offal or dead animals in any lane, alley, street or other public place within the city of Grand Rapids; nor shall any person place any garbage, offal, dead animals or other refuse matter upon any private property, whether owned by such person or not, unless the same shall be enclosed in proper vessels or tanks; such vessels or tanks to be perfectly water-tight and so kept; with tightly fitting covers, which covers shall not be removed except when absolutely necessary; and such vessels or tanks shall be kept in the rear of the house or in the basement, area or passageway so as to be readily accessible for collection, and never upon the street, alley, sidewalk or other public place; and all such tanks or vessels shall be promptly delivered to the collector when called for, and shall be returned by him to said place or places without unnecessary delay; and no person except for such purpose shall in any manner interfere with said vessels or tanks, or with the contents thereof; provided, however, that this section shall not apply to any person who immediately destroys by cremation or otherwise, satisfactory to the board of health, such garbage, offal and refuse matter.

"SEC. 3. The words 'garbage' and 'offal' as used in this ordinance, shall be held to include every refuse accumulation of animal, fruit or vegetable matter, liquid or otherwise, that attends the preparation, use, cooking, dealing in or storing of meat, fish, fowl, fruit or vegetables. And it shall be unlawful for any person to place in said vessels or tanks any ashes or soil.

"SEC. 4. Said board of health is hereby authorized and empowered to enter into a contract with a suitable person or persons for the purpose of furnishing proper vessels or tanks for the reception of garbage, offal and all other unsanitary matter, and for furnishing the necessary vehicles for collecting and removing the same in the manner directed by said board

of the city of Grand Rapids, or said board of health under the rules and regulations of said board may collect the garbage, offal and all other unsanitary matter, or collect and dispose of such substances. Such board of health shall have the power to make such rules, regulations and requirements as said board may from time to time deem for the best interests of the city; and said board may also divide said city into garbage districts, and shall have power to regulate the gathering of night soil and the collecting and conveying of dead animals, garbage, slop and offal to the crematory or other place or places as may be directed by the said board. The person entering into a contract for the collection of and removal of such garbage, offal, dead animals and other unsanitary matter, as hereinbefore stated, shall, upon the recommendation of the said board of health receive a license for that purpose, issued by the mayor of said city and no license shall be issued to any other person, firm or corporation for the gathering of such garbage; such person so licensed shall give a bond to the city of Grand Rapids, with sufficient sureties and in such amount as may be required by said board of health. The condition of such bond shall be that said person so licensed shall in all things carry out the provisions of the contract thus entered into between himself and the board of health, acting for the city, and such rules and regulations as may from time to time be made by said board of health. The word 'offal' whenever used in this ordinance shall not apply to the by-products of butchers and meat markets.

"No person, firm or corporation excepting the city of Grand Rapids, shall collect or convey through the streets of said city any garbage, offal, dead animals or other unsanitary matter, unless he, they or it shall have first received a license therefor issued by said city and execute a bond as required by this ordinance."

The ordinance is not given in full in the record but it is said that section 7 provides a penalty for failure to comply with its provisions. Various arrangements have been made by defendant city from time to time for collection and disposal of garbage. On January 2, 1917, the city undertook for a consideration to col-

lect and deliver to one Hartman all garbage of the city. In August, 1917, the person to whom Hartman had disposed of the garbage complained that plaintiffs were not delivering all of their garbage to the licensed collector of the city.

Plaintiff Pantlind was the proprietor of two hotels in the city. He also owned a farm several miles from the city upon which were fed to hogs and poultry the garbage, offal, refuse accumulations of animal, fruit and vegetable matter and other materials from the hotels. In each hotel after the dishes had been used in the dining room they were taken to the pantry and the waste and table leavings scraped off into large metal cans. Into these cans were also put peels, rinds, offal from fish and fowl and the general food waste of the hotel. Dish water was not taken. A part of this accumulation was taken by the city for which it furnished metal cans. Bread ends and other bread waste from the pantry were kept separately in a barrel. At times the better parts of the meat waste were also separately kept. Mr. Pantlind gave much of this bread and meat to charitable institutions and to the poor. Green cabbage leaves and lettuce were also kept separately in a box. Some vegetable parings were kept separately in a barrel. This cabbage and lettuce, parings, a part of the bread and meat accumulations and a part of the general garbage were taken by a Pantlind employee through the city streets to the Pantlind farm daily (except Sundays for a part of the year) by motor truck, the garbage cans being covered by metal tops and by a tarpaulin. The city received in its metal cans the rest of the garbage from these hotels. In dividing this garbage a steward of the hotels was of the opinion that plaintiff Pantlind received the better portion. Mr. Pantlind said:

"I don't know as there is any particular difference. In a way probably I get a little the best of it."

Carl Thor, who took the garbage from the hotels to the Pantlind farm, said:

"There is a difference between my garbage and the city garbage. My garbage is the very best of it, the bread and table refuse; and the poorer garbage the city takes. The stuff in the cans I get from the Morton and Pantlind is bread crumbs, pieces of meat, orange peelings, grape fruit peelings, what they scrape off the plates, selected for us and that and the dry bread is kept separate. We take the bread out in a barrel. I am familiar with the contents of these cans, both when I get them and when I dump them out on the farm. * * *

"Once in a while you get some broken plates or glasses. Occasionally I find oyster shells, coffee grounds, tea leaves. I get most of the melon rinds because it comes right off the plates, all the things they take off the plates, melon rinds, mashed potatoes, scraps of meat, etc. Very seldom get any liquid in mine.

"Q. The whole moisture is a moisture of these things together?

"A. No, the garbage is drained before it comes up to the sidewalk.

"Q. All these things together make a composite mass?

"A. The cans we keep them dry and keep out the best, there isn't much liquid.

"Q. I thought you said you put the bread mostly in a barrel?

"A. They do from the pantry where they make toast, have a barrel standing on the side; what comes back from the table goes in the cans.

"Q. Fish and all things of that sort?

"A. Well, there's quite a lot."

Plaintiff Lawrence conducted a restaurant in the city and also owned a farm beyond the city limits upon which he fed to hogs the garbage from his restaurant. The city got none of this garbage. It was sent by Mr. Lawrence through the city streets by horse and

wagon to his farm in metal cans with metal covers, the cans covered by canvas. Mr. Lawrence said:

"Whatever is left on the tables or counters goes into those tubs, thence into the garbage cans and out to the farm. The coffee grounds are in a separate tub. No dishwater goes into the garbage cans. * * *

"It might be meat; might be mash potatoes and gravy; might be bread ends. We cut each end of the loaf of bread every day and we use that on Friday for dressing. That is thrown in a cupboard and after Friday that goes into the tubs and goes out to the farm with the garbage, whatever is on the plate, if half a cup of coffee, in the plates, in the tea cups, goes. * * *

"Q. You say any leavings in the coffee or teacups are poured right in?

"A. Yes, sir; isn't very often left but if it is it goes in. Any milk left goes in, too. If there is any soup left it goes in the can.

"Q. All things from your tables, whatever they are, go into your cans?

"A. Yes, sir; potato peelings, all those things from the kitchen goes in those cans. Also any entrails from the fish or fowls, and any trimmings and melon rinds, cabbage and all that stuff."

Plaintiff Hannaford was the proprietor of a cafeteria in the city and also owned a farm near the city. His garbage was sent by him to his farm by motor car, the method being similar to that of the other plaintiffs. The city got none of this garbage. Mr. Hannaford said:

"Every bit of the garbage is fed out on the farm. The garbage isn't decayed very much, only been in the cans from 12 to 15 hours. It is loaded and hauled every day. We don't haul Sundays unless it's absolutely necessary. We do in hot weather. It is carried away in iron cans, that is the wet garbage, the dry is put in barrels. I mean lettuce leaves, vegetables and potato peelings. Any thing that is liquid is in the iron cans. There's pieces of bread that goes into the dry cans or dry barrels that is fed to the chickens or hogs."

His steward said:

"The garbage is come-back from the tables. The cans set under the dish tables and it's just scraped in. As the meals are finished, the dishes are loaded in a little truck and brought back from the dining room, laid on this table and the dishes scraped into these cans. The cans hold 20 gallons, galvanized iron with covers. No vegetable refuse goes into these cans, potato peelings and stuff go into sugar barrels or sacks. The moist garbage is carried in galvanized iron cans."

Cleanliness characterized the keeping and handling of this garbage by all of the plaintiffs. None of the plaintiffs collected or conveyed through the streets of the city any garbage but his own. On August 24, 1917, the city notified plaintiffs to discontinue forthwith the practice of disposing and collecting garbage and conveying the same through the streets of the city. On August 31, 1917, plaintiffs Pantlind and Lawrence filed their bill of complaint in the superior court of Grand Rapids alleging among other things that the city was about to proceed against them under the ordinance, to take their property, the so-called garbage, from them without compensation, to their irreparable injury, and to subject them to daily arrests, prosecutions and multiplicity of suits, and praying a temporary order and a perpetual injunction restraining the city from proceeding against them under the ordinance and from interfering with them in their transporting and conveying from their respective hotels and restaurants to their farms in the country, their so-called garbage. A temporary restraining order was allowed. Plaintiff Hannaford was permitted to intervene without objection of record. Defendant answered and by cross-bill asked affirmative relief: That the plaintiffs be required to account to the city for the garbage which had been taken to their farms and that they be enjoined from transporting through the streets of the city any garbage, and from

in any way violating the provisions of the city ordinance relating thereto. After a hearing the trial court decreed to plaintiffs the relief prayed. Defendant has appealed. Because of what was said in *Grand Rapids Board of Health* v. *Vink,* 184 Mich. 688, and *City of Grand Rapids* v. *DeVries,* 123 Mich. 570, we consider but the following: Was the material conveyed by plaintiffs through the streets garbage within the meaning of the ordinance and had the city the right to control the disposition of it? That the matter conveyed through the streets of the city by the plaintiffs to their farms was almost wholly garbage within the meaning of section 3 of the ordinance above quoted we have no doubt. It was "a refuse accumulation of animal, fruit and vegetable matter" attending the preparation, cooking and use of food in these enterprises. Century Dictionary defines refuse: "That which is refused or rejected; waste or useless matter; the worst or meanest part." See *Gardner* v. *Michigan,* 199 U. S. 325 (26 Sup. Ct. Rep. 106).

"In the case last cited (*City of Grand Rapids* v. *DeVries, supra*) it was quite plainly implied that the common council, in the exercise of the police power, had the right to treat as a nuisance all such refuse as is unfit for human food. The court may well take judicial notice that table refuse, when dumped into receptacles kept for that purpose, will speedily ferment and emit noisome odors calculated to affect the public health." *People* v. *Gardner,* 136 Mich. 693.

See, also, *Iler* v. *Ross,* 64 Neb. 710 (90 N. W. 869, 57 L. R. A. 895) ; *State* v. *Robb,* 100 Me. 180 (60 Atl. 874, 4 Ann. Cas. 275).

As to the right of plaintiffs to those wholesome substances, leavings of the kitchen or table, which are fit for food, we quote from *City of Grand Rapids* v. *DeVries, supra:*

"It may be said that the ordinance does not attempt to regulate in any manner whatever the disposition

of wholesome substances by the householder. It is
aimed only at refuse; that is, discarded, worthless
matter—matter unfit for food. The householder has
perfect liberty, under the ordinance, to consume, or
to sell or give away, all the leavings of his table or
kitchen that are fit for food."

The above language plainly implies that the city in
the exercise of its police power had the right to treat
as a nuisance all such refuse as is unfit for human
food. *People* v. *Gardner, supra.* Wholesome sub-
stances may be distinguished from garbage upon the
facts of a given case but generally speaking they may
include broken bread, meat trimmings, vegetable parts,
specked apples and the like, if fit for food. See *State*
v. *Orr,* 68 Conn. 101 (35 Atl. 770, 34 L. R. A. 279).
But when such matter is mingled with garbage it
becomes subject to public control. *Dupont* v. *District
of Columbia,* 20 App. D. C. 477.

"All authorities agree in holding that garbage in
and of itself is a nuisance." *Grand Rapids Board of
Health* v. *Vink, supra.*

Gatherers, collectors and purchasers of garbage who
conveyed the same through city streets have been held
to be violators of such ordinances (cases above cited).
*Urbach* v. *City of Omaha,* 101 Neb. 314 (163 N. W.
307) ; *People* v. *Gordon,* 81 Mich. 306.

But it is urged that a person who has produced
garbage upon his own premises has a right to dispose
of it and to convey it through the streets because it is
property of value and that as to him the ordinance
is wanting in the due process of law required by the
Constitution. Upon this point several dead animal
cases, so-called, are cited but these are not controlling.
It is not competent to declare a dead animal to be a
nuisance immediately after death. *People* v. *Gardner,
supra.* Dead animals are not nuisances *per se,* and
the city in its ordinances must pay a proper regard

for the rights of the owner in such property. *River Rendering Co.* v. *Behr,* 77 Mo. 91. Garbage cases precisely in point are not cited. But we again quote from *People* v. *Gardner,* 136 Mich. 696:

"The court may well take judicial notice that table refuse, when dumped into receptacles kept for that purpose, will speedily ferment and emit noisome odors calculated to affect the public health. If, in providing against such a nuisance, the owner of such material suffers some slight loss, the inconvenience or loss is presumed to be compensated in the common benefit secured by regulation. Horr & B. Mun. Pol. Ord. § 220."

The ordinance in the *Gardner Case, supra,* including the definition of garbage, is substantially the same as in the case at bar. In *Gardner* v. *Michigan, supra,* the language above quoted is approved and the court said:

"The defendant insists that it is part of the common knowledge of the country that the refuse from kitchens, tables, hotels and restaurants is valuable as food for swine, and is property within the meaning of the constitutional provision which forbids the taking by any State of private property for public use without compensation. * * *

"Looking at the matter in a practical light, we are unable to say that the means devised by the city council and indicated by its action were plainly unreasonable or unnecessary or did not have a real, substantial relation to the protection of the public.

"Touching the suggestion that garbage and refuse are valuable for the manufacture of merchantable grease and other products it is sufficient, in view of what we have said in the other case, to remark that it was a controlling obligation of the city, which it could not properly ignore, to protect the health of its people in all lawful ways having relation to that object; and if, in its judgment, fairly and reasonably exercised, the presence of garbage and refuse in the city, on the premises of householders and otherwise, would endanger the public health, by causing the spread of

disease, then it could rightfully require such garbage and refuse to be removed and disposed of, even if it contained some elements of value. In such circumstances, the property rights of individuals in the noxious materials described in the ordinance must be subordinated to the general good. If it be said that the city might have adequately guarded the public health and at the same time saved the property rights of its owner on whose premises garbage and refuse were found, the answer is that the city evidently thought otherwise, and we cannot confidently say that its constituted authorities went beyond the necessities of the case and exceeded their proper functions when they passed the ordinance in question. Those ordinances cannot, therefore, according to well-settled principles, be held to be wanting in the due process of law required by the Constitution."

We quote from *State* v. *Robb, supra:*

"It may therefore be regarded as settled that reasonable municipal health regulations, under the authority of the State, are not void as taking private property without due process of law, or as a taking of private property without just compensation. * * *

"That some regulation of the collection and removal of refuse and offal in thickly populated cities (is necessary) is not denied. It needs no argument to show that if the disposal of matter of that sort already decayed or which will forthwith decay, be left to the will or whim or negligence, or ignorance of its owner, or of those to whom the owner may commit it for removal, the health, to say nothing of the comfort, of the public, will be seriously endangered. Ordinances or other regulations with respect to the collection and disposal of offal and garbage have frequently been before the courts, and in no case has the power and propriety of regulation been questioned, though in some cases objectionable features in the method of regulation have been discovered. * * *

"The question now reverts to whether the regulation adopted in this case was reasonable and lawful. By its terms it gives the exclusive privilege of collecting and removing all refuse matter constituting house offal or swill, within the city of Portland, to a

person or persons specially appointed, and prohibits all other persons from engaging in that business. It even prohibits the owners upon whose premises the refuse is made, from carrying it through the streets —no matter how carefully and safely—to uses of their own outside of the city. That house offal has some appreciable value, we think, may be assumed, but as we have already seen, that fact does not save it from police regulation, if it is already noxious, or is in such condition as to require prompt intervention to prevent its becoming noxious and dangerous to health. *Harrington* v. *Board of Aldermen,* 20 R. I. 233 (38 Atl. 1, 38 L. R. A. 305). The State may even direct its destruction. *Lawton* v. *Steele,* 152 U. S. 133 (14 Sup. Ct. Rep. 499)."

See, also, *Iler* v. *Ross, supra;* 2 Dillon Mun. Corp. (5th Ed.) § 678; *State* v. *Payssan,* 47 La. Ann. 1029; *In re Zhizhuzza,* 147 Cal. 328 (81 Pac. 955) ; *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306 (29 Sup. Ct. Rep. 101).

The rights of plaintiffs in this garbage must be subordinated to the general good. They are compensated in the common benefits secured by the ordinance. The city has the right to control the disposition of this garbage agreeably to the provisions of the ordinance. The request of the defendant for an accounting which is not discussed in its brief and which is not supported by competent evidence and which was seemingly abandoned upon the hearing will be denied. The decree of the lower court is reversed and one will be entered dismissing the bill of complaint and enjoining plaintiffs from conveying garbage through the streets of the city and from in any manner violating the ordinance of the defendant city with reference to garbage or removal thereof. No costs will be awarded.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.