## GARDNER *v.* MICHIGAN.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 62.  Submitted November 9, 1905.—Decided November 27, 1905.

*Reduction Co.,* v. *Sanitary Works, ante,* p. 306, followed as to the power of municipal authorities to make suitable regulations for the disposition of garbage, and that such regulations do not amount to a taking of private property for public use without compensation within the meaning of the Federal Constitution.

Property rights of individuals must be subordinated to the general good and if the owner of garbage suffers any loss by its destruction he is compensated therefor in the common benefit secured by the regulation requiring all garbage to be destroyed.

Courts may take judicial notice of the effect of garbage on the public health.

The fact that a law relating to jury trials applicable to a particular county in a State is different from the general law on that subject applicable to all other counties is not necessarily a discrimination against the people

of the county affected and a denial of the equal protection of the law, and so *held*, in this case, it appearing that every person within the county affected was accorded equal protection of the law prevailing there.

THE facts are stated in the opinion.

*Mr. Fred A. Baker* for plaintiff in error.

*Mr. T. E. Tarsney* and *Mr. John B. Corliss* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This appeal raises for consideration the question whether a certain ordinance of the city of Detroit, relating to the collection and disposition of garbage within that city, is repugnant to the Fourteenth Amendment of the Constitution of the United States.

By the ordinance in question it was made the duty of the occupant or occupants of every dwelling house or other building in the city of Detroit to provide a suitable and watertight box, or other vessel of a convenient size, to be handled by the garbage collector, in which such occupant or occupants should cause to be placed or deposited "all offal, garbage and refuse animal and vegetable matter of the premises." Such occupants were required to keep the box or other vessel in the alley in rear of their premises, or at a place on the premises most accessible to the person collecting the garbage and offal; and it was made unlawful to put anything but refuse animal and vegetable matter in the vessel used for garbage and offal. If the vessel was placed in the alley it must be provided with a tight cover, properly hinged, and located next to the lot line, from which it should not project more than two feet into the alley. Section 1.

The remaining sections of the ordinance are in these words:

"§ 2. The word 'garbage' shall be held to include every refuse accumulation of animal, fruit or vegetable matter that

attends the preparation, use, cooking, dealing in or storing of meat, fish, fowl, food, fruit or vegetables, including dead animals and condemned foods found within the city limits. All garbage shall be collected in watertight closed metal boxes, and such boxes shall be purified as often as the health officer may direct, and shall have painted thereon the word 'Garbage.'

"§ 3. It is hereby made the duty of the contractor with the city of Detroit for the collection and removal of garbage and dead animals to collect and remove, in accordance with the ordinances and contract of the city, all garbage, dead animals, fish and refuse animal and vegetable matter found within the city limits. No other person or party except the city contractor or its agents shall carry, convey or transport through the streets, alleys or public places of the city of Detroit such materials, and it shall be unlawful for any person to interfere in any manner with the collection and disposal of such materials by the city contractor.

"§ 4. It shall be unlawful for any person to deposit, throw or place any garbage, fish, dead animals or refuse animal or vegetable matter in any avenue, alley, street or other public place within the city of Detroit; nor shall any person place such materials upon any private property, whether owned by such person or not, unless the same shall be enclosed in proper vessels or boxes, as provided in section 1.

"§ 5. The collection and removal of garbage shall be under the supervision of the board of health and it shall be the duty of the board of health and police department, through their proper officials and agents, to enforce the provisions of this ordinance." Revised Ordinances of 1895 as amended in 1901.

The city of Detroit rests the authority of its council to pass this ordinance upon its charter, which contains the following provisions: "The council shall have power to provide for the preservation of the general health of the inhabitants of the city, and to make regulations to secure the same; . . . to abate or remove any nuisance; . . . to prohibit and prevent any person from having on his premises any substance or thing

that is unwholesome or nauseous; and to authorize the removal thereof; . . . The common council is also empowered to enact and provide, by appropriate ordinance, for the manner of collecting, transporting, conveying and handling of garbage, and all animal and vegetable matter and refuse in said city; . . . and to require all persons in said city to dispose of the same in the manner provided by said common council in said ordinance for the removal and destruction thereof, and to impose and enforce appropriate penalties for any violation of said ordinance." Sec. 43, chap. 7, par. 130, Charter of the City.

By additional legislation in 1889 the Common Council was given the power "to advertise for proposals and contract for the removal, disposition and destruction of garbage and all animal and vegetable refuse for a term of years."

In 1901 the city and the Detroit Sanitary Works, a corporation of Michigan, entered into a written agreement, by which the latter undertook to collect, remove and dispose of all garbage and dead animals within the limits of the city of Detroit for the term of ten consecutive fiscal years, beginning July 1, 1901. In consideration of the faithful performance of the conditions and specifications specified in the agreement the city agreed to pay to the Sanitary Company the sum of $515,000, in equal monthly instalments of $4,291.66⅔ during the continuance of the contract.

The agreement between the city and the Sanitary Works contained, among others, the following provisions: "1. Garbage shall be understood to consist of all refuse animal or vegetable matter, including dead animals, found within the city limits, coming from private or public premises within the city. 2. The time for making the collection of garbage and dead animals shall be as follows, to wit: (a) Within and upon the public markets daily. (b) Within the two-mile circle as shown from the maps of the city, and from all hotels, restaurants, hospitals, slaughterhouses, and all other places where animals, game or fowl are killed within the said city of Detroit,

collections daily.    (c) Within all other portions of the city, collections three times in each week, times as nearly equally divided as possible.   The work of collecting said garbage shall be performed to the satisfaction and under the supervision of the board of health.   (d) The board of health shall have authority to order daily collections outside of the two-mile circle whenever in its judgment it is necessary.   The health officer shall also have authority to order extra collections to be made at any time when necessary, the contractor shall be required to cause such collections to be made within three hours of the time when such order is received by him.   (e) Garbage shall be collected in and transported through the streets of the city in vehicles with watertight closed metal boxes.   3. All garbage must be taken at least two miles outside the limits of the city of Detroit and disposed of in such manner as to entail no damage or claim against the city of Detroit for such disposal.   4. It is expressly agreed that no garbage or other refuse collected by said contractor shall be dumped into the Detroit River or any of its tributaries, or into Lake Erie or any other lake.   The common council reserves the right to make such rules and regulations with reference to the collection of the garbage as may from time to time be deemed necessary.   No employé of the contractor shall receive in the city of Detroit less than one and fifty one-hundredths dollars ($1.50) per day. In case said second party shall fail to collect garbage or dead animals in accordance with this contract, and such failure shall continue for the period of twenty-four (24) hours after a written notice from the board of health of the city of Detroit, then, and in such case, said second party shall be liable to and shall pay to the said party of the first part the penalty of two dollars ($2.00) for each and every such failure so to do."

Upon the complaint of an agent of the Sanitary Works, Gardner, the plaintiff in error, was arrested by warrant issued out of the Recorder's Court of Detroit, charged with having violated the above ordinance by unlawfully and willfully carry-

ing, conveying and transporting garbage through the streets and alleys of Detroit, he not being the city contractor or its agent.

The defendant pleaded not guilty, was tried and found guilty by a jury, and fined ten dollars.

There was no dispute at the trial as to the facts. It appeared that the defendant gathered and transported refuse from the tables of hotels, of the kinds described in the statute as garbage—acting in such matter, not for the city contractor, but for the person who bought such material from the proprietors of the hotels. He violated the statute, and was liable to the prescribed penalty, unless the ordinance was invalid. The judgment of conviction in the Recorder's Court was affirmed by the Supreme Court of Michigan, all the judges (except one who did not sit) concurring. 100 N. W. Rep. 126.

The contention of the accused at the trial was that the garbage or swill accumulated at hotels was property, and that the third section of the ordinance directing the city contractor to collect and remove it deprived the owner of his property without compensation, and therefore was in violation of the Fourteenth Amendment of the Constitution of the United States.

This contention was overruled by the trial court, the judge saying to the jury: "The defendant in this case was transporting what confessedly was garbage. It is well settled that no one may claim damages because of enforced obedience to a police regulation designed to secure and protect public health. It is manifest that, were individuals permitted to escape the regulation fixed by the common council and dispose of garbage, as they severally saw fit, all system in the collection and removal of refuse matter would be destroyed. Even if this garbage have some value for some such use as that to which the respondent's employer put it, the feeding of hogs, the courts will not, at the expense of the public health, recognize that this refuse matter, in its legal aspect, is property. No property

right has, therefore, been violated." The Supreme Court of the State thus disposed of the question: "The defendant attacks the validity of the ordinance as it relates to garbage or refuse from the tables of hotels. Similar ordinances have been before the court and sustained in *People v. Gordon,* 81 Michigan, 306, and *Grand Rapids* v. *De Vries,* 123 Michigan, 570. In these cases the question of whether there is a property right in refuse was not raised in the form in which it is here presented, although in the case last cited it was quite plainly implied that the common council, in the exercise of the police power, had the right to treat as a nuisance all such refuse as is unfit for human food. The court may well take judicial notice that table refuse when dumped into receptacles kept for that purpose will speedily ferment and emit noisome odors, calculated to affect the public health. If in providing against such a nuisance, the owner of such material suffers some slight loss, the inconvenience or loss is presumed to be compensated in the common benefit secured by regulation. Horr and Burns, Mun. Corp. § 220. The precise question involved in the present case was considered in the well-reasoned opinion of Judge Shepard in *Dupont* v. *District of Columbia,* 20 App. D. C. 477, and the conclusion reached fully sustains the holding of the trial judge."

Upon the general subject of the exercise of police powers by municipalities proceeding under legislative sanction for the protection of the public health, the views of this court have been set forth in the case of *California Reduction Co.* v. *Sanitary Reduction Works, ante,* p. 306, just decided, and what has been said in the opinion in that case is, we think, decisive against the present defendant. It is appropriate, however, to make some observations in reference to certain features of the present case.

The defendant insists that it is part of the common knowledge of the country that the refuse from kitchens, tables, hotels and restaurants is valuable as food for swine, and is property within the meaning of the constitutional provision which for-

bids the taking by any State of private property for public use without compensation. Of course, all know that such a use of refuse is not uncommon in some localities, although modern investigation shows that a good deal may be said against such a practice. It is believed by some that the feeding of garbage to swine produces an inferior quality of pork. There is authority for the statement that in 1889 the Massachusetts Board of Health reported, as the result of its investigation, that garbage-fed hogs were afflicted with trichinosis to the extent of thirteen per cent. In some States it is forbidden by statute to feed garbage to milch cows, and in some cities it is forbidden to sell milk from garbage-fed cows. Chapin's Municipal Sanitation in the United States, 699, 700. We do not, of course, express any opinion as to these matters, and refer to them only in order to bring out the thought that the question before the municipal authorities of Detroit was one in respect of which there was room for difference of views as to what means were best for the protection of the public health. Looking at the matter in a practical light, we are unable to say that the means devised by the city council and indicated by its action were plainly unreasonable or unnecessary or did not have a real, substantial relation to the protection of the public.

Touching the suggestion that garbage and refuse are valuable for the manufacture of merchantable grease and other products it is sufficient, in view of what we have said in the other case, to remark that it was a controlling obligation of the city, which it could not properly ignore, to protect the health of its people in all lawful ways having relation to that object; and if, in its judgment, fairly and reasonably exercised, the presence of garbage and refuse in the city, on the premises of householders and otherwise, would endanger the public health, by causing the spread of disease, then it could rightfully require such garbage and refuse to be removed and disposed of, even if it contained some elements of value. In such circumstances, the property rights of individuals in the noxious

materials described in the ordinance must be subordinated to the general good. If it be said that the city might have adequately guarded the public health and at the same time saved the property rights of its owner on whose premises garbage and refuse were found, the answer is that the city evidently thought otherwise, and we cannot confidently say that its constituted authorities went beyond the necessities of the case and exceeded their proper functions when they passed the ordinance in question. Those ordinances cannot, therefore, according to well-settled principles, be held to be wanting in the due process of law required by the Constitution.

The defendant further contends, as he contended in the Supreme Court of the State, that the act of the Michigan legislature, creating the Board of Jury Commissioners for Wayne County, in which the present trial occurred, denies to accused persons and other litigants in that county the equal protection of the laws. The ground of this contention. is, that by the general laws of the State the officers authorized to make and return the jury list were elected by the people in their several townships and in city wards, Const., Art. XI, § 1; *Attorney General* v. *Detroit*, 29 Michigan, 108, and required that jurors should be of those who are assessed on the assessment roll, while by the Wayne County jury law of 1893, as amended in 1895, Pub. Acts, 1893, p. 337; Pub. Acts, 1895, p. 69, the jury lists are made up and returned by a board of seven jury commissioners, appointed by the Governor, with the consent of the Senate, and the names of persons to be returned need not appear on the assessment rolls. This difference between the general law relating to jury trials and the special law relating to Wayne County, it is said, constitutes a discrimination against the people of that county, and amounts to a denial to them of the equal protection of the law. This view does not commend itself to our judgment. It is fully met and shown not to be sound, by the judgment in *Missouri* v. *Lewis*, 101 U. S. 22, 30, where Mr. Justice Bradley, speaking for the court, and referring to the Fourteenth Amendment, said: "The last re-

striction, as to the equal protection of the laws, is not violated by any diversity in the jurisdiction of the several courts as to subject matter, amount, or finality of decision, if all persons within the territorial limits of their respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress. Each State has the right to make political subdivisions of its territory for municipal purposes, and to regulate their local government. As respects the administration of justice, it may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion. Convenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a State to regulate its internal affairs to deny to it this right. We think it is not denied or taken away by anything in the Constitution of the United States, including the amendments thereto.

"We might go still further, and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its methods of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there, he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances."

· Perceiving no error in the record touching any Federal question, the judgment is

*Affirmed.*

Mr. Justice Brewer and Mr. Justice Peckham dissent · from the opinion so far as it relates to the ordinances in question.