[No. S029150. Mar. 31, 1994.]

WASTE MANAGEMENT OF THE DESERT, INC., et al., Plaintiffs and Respondents, v.
PALM SPRINGS RECYCLING CENTER, INC., Defendant and Appellant.

480

## COUNSEL

Crandall & Traver, Lynn D. Crandall and Lisa A. Garvin for Defendant and Appellant.

Flanigan & Flanigan, Timothy H. Flanigan, Terrance W. Flanigan, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady, Susan S. Ellenberg, Sedgwick, Detert, Moran & Arnold, Sean H. Gallagher, Livingston & Mattesich, James M. Mattesich, Carol L. Livingston, Lisa L. Halko, Pillsbury, Madison & Sutro, Kevin M. Fong, Sharon M. Solomon, Stone & Moore and John Douglas Moore as Amici Curiae on behalf of Defendant and Appellant.

Jean Leonard Harris, J. Scott Zundel, Schlecht, Shevlin & Shoenberger and Jon A. Shoenberger for Plaintiffs and Respondents.

Hallgrimson, McNichols, McCann & Inderbitzen, Harvey E. Levine, John T. Schreiber and Claudia J. Martin as Amici Curiae on behalf of Plaintiffs and Respondents.

Shute, Mihaly & Weinberger, E. Clement Shute, Jr., Richard S. Taylor, Astor & Phillips, Z. Harry Astor and John K. Astor as Amici Curiae.

## OPINION

BAXTER, J.—The California Integrated Waste Management Act of 1989 (the Act) authorizes cities to grant exclusive franchises for solid waste handling services. (Pub. Resources Code, § 40059, subd. (a)(2).) The question is whether this authority extends so far as to prohibit the owner of recyclable materials from selling them to someone other than the exclusive franchisee. Whether the Legislature has authorized such franchises is solely a question of statutory construction.

We hold the Act does not allow an exclusive franchise for the collection of recyclables not discarded by their owner. As we shall explain, the Act

authorizes exclusive franchises only for "solid *waste* handling." (Italics added.) An item that is sold is not discarded and thus does not become "waste" subject to an exclusive franchise.

The exclusive franchise agreement in this case between plaintiffs City of Rancho Mirage (City) and Waste Management of the Desert, Inc. (Waste Management) is therefore invalid and unenforceable to the extent the exclusive franchise purports to include recyclable materials that are not waste under the Act. The trial court erred in enjoining defendant Palm Springs Recycling Center, Inc. (Palm Springs Recycling) from collecting such recyclable materials within City limits.

FACTS

The City contracted with Waste Management for the collection and disposal of residential and commercial waste within the City limits (the Agreement). The Agreement consists of two parts, a "Refuse Collection Agreement" and a "Recycling Agreement." Under the Refuse Collection Agreement, Waste Management has the obligation and exclusive right to collect, receive, transport, segregate, recycle, and dispose of residential and commercial refuse of the type customarily deposited by residents and businesses in collection containers or areas for pickup and disposal. The Refuse Collection Agreement does not prohibit any person from transporting that person's own refuse to a legal dump site.

The Recycling Agreement provides that Waste Management has the obligation and exclusive right to collect and remove all specified materials that are segregated and placed in separate recycling containers at the curbside on public streets or adjacent to multifamily complexes or in bins at locations designated by commercial establishments. Subject to specified limitations, Waste Management is authorized to retain the revenue from the sale of recyclable materials.

When it entered into the Agreement, the City adopted ordinance No. 8.12.010 (Ordinance), providing that "[a]ll garbage and rubbish accumulated in the city shall be collected, conveyed and disposed of by the city or by any person with whom the city has a contract for the collection, removal, and disposal of ashes, waste matter, garbage and rubbish. Except as otherwise provided in this chapter, no person, other than the city or its contract agent, shall collect, convey over any of the streets or alleys of the city, or dispose of any refuse accumulated in the city."

Under its exclusive franchise, Waste Management established a citywide recycling program for single-family residences, multifamily complexes, and commercial establishments.

In May 1991, the City and Waste Management sued Palm Springs Recycling, alleging that beginning in 1990 Palm Springs Recycling "had been sending trucks into [the City] on a regular basis to collect recyclable material from large commercial customers" in violation of the rights of the City and Waste Management under the Agreement and the Ordinance, and had refused to comply with demands made by the City that Palm Springs Recycling cease those activities. The complaint sought preliminary and permanent injunctive relief prohibiting Palm Springs Recycling from collecting recyclable materials within the City.

Palm Springs Recycling admitted it had sent trucks into the City on a regular basis to collect recyclable materials from commercial customers and had continued to solicit new customers within the City's boundaries. It denied, however, engaging in illegal activities or interfering with plaintiffs' rights under the Agreement, asserting as affirmative defenses that: (1) The City had acted in excess of its police power by enacting the Ordinance and entering into the Agreement; (2) the Agreement constituted an illegal combination in restraint of trade under Business and Professions Code section 16600 et seq.; and (3) the Ordinance and Agreement, as construed by plaintiffs, constituted an invalid taking of property in violation of the Fifth Amendment to the United States Constitution and article I, section 19 of the California Constitution.

Palm Springs Recycling also filed a cross-complaint against plaintiffs: (1) essentially reasserting the affirmative defenses set forth in the answer to the complaint; (2) seeking an order enjoining Waste Management from providing recycling services to residents of the City at less than cost and enjoining the City from enforcing the Ordinance and the Agreement as they related to recycling and the collection of recyclable materials; and (3) requesting related affirmative relief.

The City and Waste Management alleged as affirmative defenses to the cross-complaint that the Ordinance and Agreement were authorized by the Act and that the Agreement and enforcement of the Ordinance against Palm Springs Recycling were within the City's police power.

The trial court granted plaintiffs' application for a preliminary injunction. The court entered judgment for plaintiffs both on their complaint and on defendant's cross-complaint, enjoining Palm Springs Recycling from placing bins or other receptacles within the City for the purpose of collecting recyclable materials and from collecting or removing recyclable materials from within the City. (The judgment did not specifically define the term

"recyclable materials," but the context makes clear the term was intended to correspond to the use of the same term in the exclusive franchise contract. Palm Springs Recycling has not suggested the recycling activities enjoined by the judgment included the recycling of materials other than those that Waste Management must recycle under the Agreement.)

The Court of Appeal reversed the judgment. The court held the Act does not authorize the City to grant an exclusive franchise for the collection and removal of "recyclable materials" that have not been placed into separate containers maintained by the City or its authorized waste collector or that otherwise are not "discarded" by the owner. The court relied on Public Resources Code section 41952's provision that "[n]othing in this chapter limits the right of any person to donate, sell, or otherwise dispose of his or her recyclable materials." The court concluded that, until the generator of recyclable materials discards them into the specified bins, the owner retains control over the materials' disposition and is free to have them collected by a recycling enterprise of the owner's choice. The court further held the City's police power, apart from the Act, did not authorize the City to restrict recycling services to the waste collection enterprise exclusively designated by the City.

## DISCUSSION

The Act sets forth a comprehensive statewide program for solid waste management. (Pub. Resources Code, § 40000 et seq.) (All further section references are to the Public Resources Code unless otherwise noted.) No one disputes that the Act allows a local agency to award an exclusive franchise for "solid *waste* handling" services. (§ 40059, subd. (a)(2), italics added.) The question is whether property with a market value to its owner—for example, a recyclable material—is "waste" within the scope of the Act and its exclusive franchise provision. We conclude this property is not "waste" until it is discarded. This construction encompasses two concepts—value and discarding—that in this context must be considered in relation to one another.

### 1. *Economic value to the owner*

"The concept of market value is perhaps most clearly stated in the poetic axiom that, 'The worth of a thing, is the price it will bring.' " (*Union Pacific R.R. Co.* v. *State Bd. of Equalization* (1989) 49 Cal.3d 138, 148 [260 Cal.Rptr. 565, 776 P.2d 267], quoting 1 Bonbright, Valuation of Property (1st ed. 1937) p. 15.) If the owner of a material can sell it, perhaps for the reason that it is recyclable, it has an economic (i.e., market) value to its owner.

The Act's very title, the California Integrated *Waste* Management Act of 1989, and its repeated references to "solid *waste*," "solid *waste* handling," "recycling of solid *wastes*," and the like strongly indicate the Legislature was concerned with just what it said—*waste*—and not with materials of economic value to their owner. The Act's own definition of "solid waste" further supports the view that valuable recyclables that have not been discarded are not waste. "Solid waste" is defined as "all putrescible and nonputrescible solid, semisolid, and liquid wastes, including garbage, trash, refuse, paper, rubbish, ashes, industrial wastes, demolition and construction wastes, abandoned vehicles and parts thereof, discarded home and industrial appliances, dewatered, treated, or chemically fixed sewage sludge which is not hazardous waste, manure, vegetable or animal solid and semisolid wastes, and other discarded solid and semisolid wastes." (§ 40191, subd. (a).) This definition hardly connotes the notion of valuable materials.

■ The commonly understood meaning of "waste" is something discarded "as worthless or useless." (Amer. Heritage Dict. (1985) p. 1365, col. 1; 19 Oxford English Dict. (2d ed. 1989), p. 958, col. 1.) If the owner sells his property—that is, receives value for it—the property cannot be said to be worthless or useless in an economic sense and is thus not waste from the owner's perspective. Conversely, if the owner voluntarily disposes of the property without receiving compensation or other consideration in exchange—that is, throws it away—the obvious conclusion is that the property has no economic value to the owner. The concept of value is in this sense related to the manner in which the property is disposed of.

2. *Valuable materials not discarded*

■ The Act's definition of waste also reflects the traditional view that waste—at least for purposes of its collection—is material that has been *discarded* by its owner. Section 40191, subdivision (a) defines solid waste as being several enumerated types of materials and "*other discarded* solid and semisolid wastes." (Italics added.) The restrictive modifier "other *discarded*" plainly refers to all the enumerated materials in the statute, thereby meaning that an item is not waste until it is discarded.

The Court of Appeal also relied heavily on this statutory definition of "waste" in concluding that "only *discarded* waste materials become solid waste subject to 'handling' " under the Act. Plaintiffs object to this approach, contending it would eviscerate the Act because owners could discard all their property—recyclable and otherwise—as they see fit and thereby render an exclusive solid waste handling franchise a nullity as a practical matter. In

other words, the Court of Appeal opinion might be read to mean that a property owner could decide unilaterally with whom he will discard his waste. If three competing waste handlers (the exclusive franchisee and two others) placed their respective receptacles at the owner's curbside, he could put his waste into whichever container he chooses. Perhaps the Court of Appeal did not intend that result, but its opinion might be read as suggesting as much and, if so, we believe this result would be inconsistent with the Act's apparent intent. If, however, the concept of being discarded is properly understood, this perceived problem is easily avoided.

This returns us to the concept of value. Property that is sold for value—for example, a recyclable—is not "discarded" under any traditional understanding of the term. ■ "Discard" means "to throw away." (Amer. Heritage Dict. (2d college ed. 1982) p. 402, col. 1.) It is not synonymous with the broader term "dispose," which means "[t]o transfer or part with, as by giving or selling." (*Id.*, at p. 407, col. 2.) A homeowner, for example, can dispose of used furniture, clothing, or automobiles by discarding them or by selling them, but either method of disposition necessarily precludes the other. If he sells the property, he cannot discard it; and if he discards it, he cannot sell it. That "discard" connotes throwing away or abandoning has been well recognized in cases dealing with waste and related issues. (*American Min. Congress* v. *U.S. E.P.A.* (D.C. Cir. 1987) 824 F.2d 1177, 1184 [263 App.D.C. 197]; *Reading Co.* v. *City of Philadelphia* (E.D. Pa. 1993) 823 F.Supp. 1218, 1236-1237; *Carothers* v. *Capozziello* (1990) 215 Conn. 82 [574 A.2d 1268, 1291]; *Darling Delaware Corp.* v. *District of Columbia* (App. D.C. 1977) 380 A.2d 596, 597; *Ticonderoga Farms* v. *County of Loudoun* (1991) 242 Va. 170 [409 S.E.2d 446, 449].)

■ The Court of Appeal opinion did not reflect the distinction between selling and discarding. Perhaps an example will illustrate. Assume that, as in this case, there is an exclusive franchise. A property owner throws his recyclables into the receptacle provided by the franchisee and does so without receiving compensation. He has plainly discarded his property, and it is thus waste under the Act. Could he instead throw the property into the bin of a competing waste hauler without receiving compensation? No, because by disposing of the property without receiving compensation, he has discarded the property and thereby rendered it waste that is subject to the exclusive franchise. If, however, he is paid for the material by the franchisee's competitor, the owner has sold the property and thus has not discarded it, so it has not become waste.

An especially relevant example of the distinction between selling and discarding is found in *Darling Delaware Corp.* v. *District of Columbia,*

*supra*, 380 A.2d 596, in which a company that purchased and transported meat fat and bones from grocery stores and markets and then sold them for processing into other products, e.g., tallow, soup, and margarine, was charged with hauling solid waste without a license. The question was whether the materials were waste. As in the present case, the statute defined waste as being "discarded materials." The court relied on the traditional meaning of "discard." "It 'indicates dispensing with, letting go of, getting rid of as not immediately useful.' " (*Id.*, at p. 597, quoting Webster's Third New Internat. Dict. (1971).) The court then concluded, "At no point in the chain of purchase and sale of these animal by-products were they ever discarded. The record reflects that they were either sold by grocery stores directly to a few retail customers or frozen for sale to large buyers such as appellant. Appellant promptly transported them to plants in New York where they were resold for processing into other useful products. Since these materials were never thrown away as not immediately useful, they cannot be said to have constituted waste . . . ." (*Id.*, at p. 598, fn. omitted.) The same analysis obtains in this case. If an owner segregates recyclable or otherwise useful materials and sells them, he has not discarded them and they do not become waste.

The view that all items enumerated in section 40191, subdivision (a) are waste, regardless of their value and whether they have been discarded, is further called into question by many of the types of items enumerated. For example, the statute refers to "paper." This can refer to all paper, however, only if the term is taken out of context and without consideration of value or the statute's stated limitation that it applies only to discarded materials. A piece of elaborate origami, a collector's autograph collection, or a watercolor painting are each indisputably paper, but we doubt anyone would seriously contend such an item is waste and that its owner cannot keep it or sell it as he sees fit. The obvious, intuitive, and correct response to the contention would be that the property has value and that the owner has not discarded the property if he sells it. That is, the property has not become waste.

■ The tension between plaintiffs and the Court of Appeal can be eliminated by relying on the distinction between selling and discarding. The Court of Appeal was correct that property does not become waste under the Act until discarded, but incorrect in suggesting (perhaps inadvertently) that the owner can *discard* the property as he sees fit. Discarding is governed by the Act. Selling and other methods of disposition by which the owner receives or donates the value of the recyclable materials are not discarding and are not subject to the Act. The fundamental purpose of the Act is to reduce the amount of material entering into the waste stream. The buying

and selling of materials in the marketplace is inapposite to that purpose because those materials remain in circulation and do not enter into the waste stream.

■ The proper rule is this: If the owner of property disposes of it for compensation—in common parlance, sells it—it is not waste because it has not been discarded. The owner is not required under the Act to transfer this property to the exclusive franchisee. But, consistent with the purpose of the Act, an owner cannot *discard* property as he sees fit. Discarding the property renders the property waste and subjects it to the Act.

### 3. *The owner's right to sell recyclables*

■ If one accepts the general proposition that an owner has a right to sell his property for value, the question then becomes whether a different rule should apply to a particular type of property—property defined as recyclable materials in the Recycling Agreement between the City and Waste Management. Under plaintiffs' view, a special rule should apply to recyclables in light of the statutory definitions of solid waste handling and recycling. We read these provisions differently.

"Solid waste handling" is defined as "the collection, transportation, storage, transfer, or *processing of solid wastes.*" (§ 40195, italics added.) *"Processing"* is, in turn, defined as "the reduction, separation, recovery, conversion, or recycling of *solid waste.*" (§ 40172, italics added.) Put simply, solid waste handling includes recycling—of *solid waste.* If, as explained above, the owner does not discard his property, it does not become waste in the first instance. Thus, even if the property might be viewed as a feasibly recyclable *material,* it is not necessarily a recyclable *waste.* The distinction is significant because only the recycling of *waste* is included within the Act's definition of solid waste handling and, in turn, the provision allowing exclusive franchises.

Plaintiffs also point to section 40180's definition of "recycling" as "the process of collecting, sorting, cleansing, treating, and reconstituting *materials* that would otherwise become solid waste, and returning to the economic mainstream in the form of raw material for new, reused, or reconstituted products . . . ." (Italics added.) Perhaps plaintiffs are relying primarily on the word "material" and concluding that all recyclable materials are subject to an exclusive franchise even if they do not become waste. If so, we disagree. Section 40180's reference to materials is merely an acknowledgment of the reality that, as a technological matter, *materials* are capable of being recycled. The provisions, however, that define solid waste handling

refer only to "recycling of solid *waste*," not to the recycling of solid *materials*. (§§ 40172 & 40195, italics added.) If the statutes were worded otherwise, the mere fact that something is capable of being recycled would render it subject to an exclusive franchise, thereby prohibiting the owner from selling it.

Moreover, section 40180 is itself consistent with the view that only waste is subject to the Act. The section refers to "materials that *would otherwise become solid waste*." (§ 40180, italics added.) If an owner discards property, it enters into the waste stream if not recycled. But, if a material is sold, it is not a material "that would otherwise become solid waste." As explained above, it becomes waste only when discarded. Thus, if an owner sells an item, it does not enter the solid waste stream, the reduction of which is the fundamental purpose of the Act.

The injunction in this case is directed at a commercial recycling activity, but the logic of plaintiffs' view would extend inexorably to non-commercial activity as well, for example, a school newspaper drive, a youth group's gathering of empty soda pop containers, or clothing donations to the Salvation Army. (Indeed, even gifts from one individual to another would be suspect, for example, a person who gives scrap metal to a sculptor of welded art.) The items collected in such activities are often recyclable *materials*. Nothing, however, in the language or legislative history of the Act suggests the Legislature intended to eliminate gifts to charity or gifts between friends. As with items that are sold, gifts cannot be fairly said to have entered the solid waste stream. Moreover, a gift of valuable property, like a sale of such property, is a transfer of value and thus cannot properly be characterized as "discarding" under the Act.

In short, if the owner of recyclable materials *discards* them into the solid waste stream, they become solid waste subject to the Act, and an exclusive franchisee would have the right to collect that waste in accordance with its franchise agreement. If, however, the owner disposes of the recyclables for compensation—in common parlance, sells them—the recyclables are not discarded and do not become waste.

We therefore hold that the owner of undiscarded recyclables is not required to transfer them to the holder of an exclusive franchise under the Act. The Recycling Agreement between plaintiffs City and Waste Management is unenforceable under the Act to the extent the franchise purports to include recyclable materials that have not become "waste," as we have construed the term.

Plaintiffs contend Palm Springs Recycling is seeking "to skim the cream of the recycling business" by collecting only the more commercially valuable materials and that a comprehensive recycling program cannot be economically sustainable absent an exclusive franchise that includes recyclable materials. This misses the mark in two respects. First, it suggests that Palm Springs Recycling is somehow taking something of value from Waste Management. Not so. The "cream" belongs to the owner of the recyclable material. Second, the contention is better addressed to the Legislature. Our holding is based on the Act as it is written, not on a different, perhaps broader, version that could have been, or still may be, enacted.

Finally, we address plaintiffs' additional argument that the City's award of the exclusive franchise was a valid exercise of the police power. This argument is not clearly presented, but it seems to have two, perhaps three, aspects. First, the focus of the argument is the state's police power. In light of our conclusion that the Act does not support the exclusive franchise in this case, whether the state constitutionally could have framed the Act to allow the franchise is beside the point.

Second, plaintiffs also assert, albeit cryptically and only in passing, that the exclusive franchise is a valid exercise of the City's own police power. Plaintiffs seem to suggest the City properly exercised that power under the Act. The argument necessarily fails because, as we have explained, the Act does not itself authorize the franchise to extend to nondiscarded recyclables.

Third, plaintiffs also suggest the City had the police power independent of the Act to award an exclusive franchise for the collection of undiscarded recyclables. We decline to decide the correctness of the Court of Appeal's determination of that issue. (Cal. Rules of Court, rule 29.2(a).) The primary focus in this court has been the scope of the City's power *under the Act*. And, the question of the City's own police power raises the important issue of whether the comprehensive Act has preempted any power the City might otherwise have had.

Under our construction of the Act, we need not address Palm Springs Recycling's other arguments.

## DISPOSITION

The judgment of the Court of Appeal is affirmed with one modification. The court directed the trial court to issue an injunction prohibiting the City from enforcing the Ordinance against Palm Springs Recycling with respect to "recyclable materials [which] have not been turned over to City or its

agent as discussed in this opinion." This was consistent with the Court of Appeal's view that the owner of recyclables can discard them as it wishes. As we have explained, our view is narrower—that, if the materials are "discarded," as we have construed the term, they are subject to the exclusive franchise.

To accommodate this difference, the judgment of the Court of Appeal is affirmed with directions to remand this matter to the trial court with directions to issue a permanent injunction and/or writ of mandate in favor of defendant Palm Springs Recycling prohibiting the City from enforcing the Ordinance either by criminal prosecution or injunctive relief against defendant for engaging within the City's boundaries in the business of collecting, receiving, transporting, segregating, recycling, and disposing of recyclable materials that are acquired for compensation by Palm Springs Recycling from commercial establishments.

Defendant shall recover its costs on appeal.

Lucas, C. J., Kennard, J., Panelli, J.,* and Cottle, J.,† concurred.

**GEORGE, J.**—I respectfully dissent.

In April 1990, the City of Rancho Mirage entered into an exclusive franchise agreement with Waste Management of the Desert, Inc. (Waste Management), under which Waste Management agreed to provide specified waste disposal and recycling services to all of the city's residents and commercial entities, at regulated rates, and the city, in return, agreed to authorize only Waste Management to provide such services within the city's boundaries. Shortly thereafter, Palm Springs Recycling Center, Inc. (Palm Springs Recycling), a competing commercial recycling enterprise, began sending its trucks into the city on a regular basis to collect recyclable material from large commercial customers, in violation of Waste Management's rights under the exclusive franchise agreement. In response, the city and Waste Management sought injunctive relief from the trial court, which granted an injunction prohibiting Palm Springs Recycling from engaging in recycling services within the boundaries of the City of Rancho Mirage in violation of the exclusive franchise agreement.

The majority overturns the trial court injunction, concluding that the City of Rancho Mirage lacked authority to enter into an exclusive franchise

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, Sixth Appellate District, assigned by the Acting Chairperson of the Judicial Council.

agreement for recycling services, insofar as that agreement limited the right of competing recycling companies to purchase and collect designated recyclable materials within city limits. Although the majority acknowledges that, under the California Integrated Waste Management Act of 1989 (the Act), the Legislature explicitly has authorized municipalities to enter into exclusive franchise agreements for "solid waste handling services," the majority concludes that the municipality's authority under this legislation does not extend to "recyclable material" that has a market value and that the owner wishes to sell to a commercial entity other than the exclusive franchisee.

As I shall explain, I believe the majority's interpretation of the relevant legislation is clearly incorrect and will frustrate, rather than further, the important purposes of the Act by excluding a significant proportion of recyclable material from its operation. A glaring omission of the majority is its failure to acknowledge the fundamental legislative policies and objectives of the 1989 legislation—the promotion of "*integrated* waste management"—and the various components of the Act designed to accomplish these policies and objectives. Construing the statutory scheme as a whole, I believe it is clear that the Act authorizes the exclusive franchise agreement at issue in this case, and that the trial court did not err in enjoining the commercial activities of Palm Springs Recycling that violated the agreement, including the purchase and collection of materials that in the past would have been discarded as waste, but that now have some market value because of their recycling potential.

I

The Act comprises a comprehensive program for solid waste management throughout the state, reflecting the legislative concern that ever-increasing amounts of disposable waste, combined with diminishing waste disposal capacity, pose a threat of crisis proportion to the environment and the public health and welfare, presenting an "urgent need" for an "aggressive new integrated waste management program." (Pub. Resources Code, § 40000; see Assem. Natural Resources Com. Rep., Integrated Waste Management: Putting a Lid on Garbage Overload (1988) p. i. ["Current State solid waste management policy is becoming increasingly ineffective in managing California's solid waste and is potentially harmful to public health and the environment."] [hereafter Assembly Report].)[1]

Under the Act, the responsibility for solid waste management is shared by the state and local governments (§ 40001), with solid waste handling services to be provided by one or any combination of the following: the local

---

[1]The Act incorporates in substantial part the provisions of its predecessor statutory scheme, the Solid Waste Management and Resource Recovery Act of 1972, formerly contained in the Government Code, the Health and Safety Code, and the Revenue and Taxation Code, the

entity itself, another local entity, or a private waste collection enterprise (§ 40058). A major component of the Act, not contained in the predecessor statutory scheme, is the substantial mandatory solid waste disposal diversion requirements imposed by section 41780. That section provides in part that cities and counties, through solid waste reduction, recycling, and composting activities, "shall divert 25 percent of all solid waste from landfill . . . by January 1, 1995" and "50 percent of all solid waste by January 1, 2000." (§ 41780, subd. (a)(1) & (2).)

To meet these waste diversion requirements, the Act requires cities to develop and implement integrated waste management plans providing for the reduction, recycling, and reuse of solid waste, to the maximum extent feasible, in an efficient and cost-effective manner.[2] (§§ 40052, 40900, 41000.) Such local plan must include a "source reduction and recycling element" (§§ 40901, 41000), which in turn must incorporate a "recycling" component. (§ 41003.) The recycling component must include a recycling program and implementation schedule that demonstrate the recycling methods, in combination with the source reduction and composting components,

provisions of which were repealed or recodified concurrently with the adoption of the Act. (Stats. 1989, ch. 1095, p. 3810.)

The Act also reflects, however, many of the concepts and policies developed by the Municipal Solid Waste Task Force (an arm of the federal Environmental Protection Agency), as set forth in the task force's 1989 report on the national waste management crisis. The introduction to the task force's report explains in part: "From 1960 to 1988, [the United States] generated more waste every year, both in total tonnage and in pounds per person, and this trend is projected to continue. In addition, we are running out of places to put our waste because old landfills are closing and few new landfills and combustors are able to be sited and built. There are concerns about potential threats to human health and the environment from combustor emissions and ash, from landfill emissions, leachate, and litter . . . . [¶] . . . This report recommends using 'integrated waste management' systems to solve municipal solid waste generation and management problems at the local, regional, and national levels." (Final Rep. of the Municipal Solid Waste Task Force, United States Environmental Protection Agency, The Solid Waste Dilemma: An Agenda for Action (Feb. 1989) pp. 1-2.)

All further statutory references are to the Public Resources Code unless otherwise indicated.

[2]In its report, cited at footnote 1, *ante*, the Municipal Solid Waste Task Force observes that "[a] key element of integrated waste management is the hierarchy, which favors source reduction (including reuse) to first decrease the volume and toxicity and increase the useful life of *products* in order to reduce the volume and toxicity of *waste*. Recycling (including composting) is the preferred waste management option to further reduce potential risks to human health and the environment, divert waste from landfills and combustors, conserve energy, and slow the depletion of nonrenewable natural resources." (The Solid Waste Dilemma: An Agenda for Action, *supra*, at p. 2, italics in the original.) This suggested hierarchy is adopted in section 40051, providing in part that local agencies shall "[p]romote the following waste management practices in order of priority: [¶] (1) Source reduction. [¶] (2) Recycling and composting. [¶] (3) Environmentally safe transformation and environmentally safe land disposal, at the discretion of the city or county." (§ 40051, subd. (a).)

by which the city will reduce a sufficient amount of solid waste disposed of by the city in order to comply with the diversion requirements of section 41780. (§ 41070.) Failure to submit a timely plan incorporating these components, or failure to implement the plan and meet the diversion requirements and deadlines, will subject a city to penalties of up to $10,000 per day. (§§ 41813, 41850.)

The requirement of an integrated waste management plan corresponds to the recommendation of the Assembly Report that California waste management "be revised to place greater emphasis on a multi-faceted approach to solving the State's garbage woes" through an *integrated* waste management program, in which *mandatory recycling* measures may be incorporated into the overall solid waste planning process. (Assem. Rep., *supra*, at pp. i.,1-2, 53-60.)

II

Long before the adoption of the Act, it was well established that the regulation and control of waste collection and disposal constituted a proper exercise of municipal police power reserved to state and local governments. (See *City of Camarillo* v. *Spadys Disposal Service* (1983) 144 Cal.App.3d 1027, 1030 [193 Cal.Rptr. 22]; *Matula* v. *Superior Court* (1956) 146 Cal.App.2d 93, 99-101 [303 P.2d 871]; *Davis* v. *Santa Ana* (1952) 108 Cal.App.2d 669 [239 P.2d 656]; see also Health & Saf. Code, former § 4250; Gov. Code, former § 66757, subd. (b).) Furthermore, for nearly a century, California courts explicitly have affirmed the authority of cities and counties, in the exercise of their police power, to control waste collection and disposal by the means deemed most effective for the public health and safety, including the granting of exclusive waste collection and disposal privileges to one or more private enterprises.

Thus, for example, in *In re Zhizhuzza* (1905) 147 Cal. 328 [81 P. 955], this court, upholding a city ordinance restricting waste collection privileges by exclusive contract, held: " 'Laws or ordinances enacted under the police power for the protection of the public health, reasonably adapted to that end, are not unconstitutional because they may incidentally operate to deprive individuals of their property or its use without compensation, or interfere with their personal liberty, nor because they may give one person a monopoly of a certain business or occupation, private rights being required to yield in such case to the public good.' " (*Id.*, at p. 335; see *California Reduction Company* v. *Sanitary Works* (1905) 199 U.S. 306, 321 [50 L.Ed. 204, 211, 26 S.Ct. 100] [granting of exclusive waste disposal privileges within City and

County of San Francisco was authorized by state constitutional provision for local determination of the "most appropriate method of protecting the public health in the matter of disposal of garbage, refuse and other materials found on private premises"]; *Gardner v. Michigan* (1905) 199 U.S. 325 [50 L.Ed. 212, 26 S.Ct. 106].)

The principles articulated in *In re Zhizhuzza, supra,* 147 Cal. 328, have been reiterated and affirmed repeatedly in subsequent decisions rendered through the present decade. (See *City of Camarillo v. Spadys Disposal Service, supra,* 144 Cal.App.3d. at pp. 1030-1032 [decision to restrict the issuance of waste disposal permits to no more than one company "falls within the clearly articulated and affirmatively expressed policy of the state"]; *City of Santa Rosa v. Industrial Waste & Debris Box Rentals, Inc.* (1985) 168 Cal.App.3d 1132, 1135 [214 Cal.Rptr. 737]; *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 149, fn. 1 [117 Cal.Rptr. 525]; *Matula v. Superior Court, supra,* 146 Cal.App.2d at pp. 99-101; see also *Hybud Equipment Corp. v. City of Akron, Ohio* (6th Cir. 1981) 654 F.2d 1187, 1192 ["Courts in literally hundreds of reported cases have upheld the authority of local governments to monopolize and control local garbage collection by eliminating or restraining competition among private collectors."].)

Cities and other local entities that have opted to rely upon an exclusive franchise for all waste handling services within their local boundaries traditionally have explained such action on the ground that competition in the solid waste handling industry may impede necessary regulation and encourage cost-cutting devices that pose a threat to the public health. Such entities apparently have concluded that the designation of an exclusive waste handling enterprise is an efficacious method to ensure that all persons and businesses within a community will be served at reasonable rates, regardless of their individual circumstances, and to minimize the noise and disruption of collection. (See *City of Santa Rosa v. Industrial Waste & Debris Box Rentals, Inc., supra,* 168 Cal.App.3d 1132, 1134-1135.)

### III

Recognizing that local entities generally are in the best position to determine the preferable means of addressing the health and safety problems posed by the handling and disposal of waste, the Act contemplates that local agencies may utilize exclusive franchises with private solid waste handling enterprises to implement the purposes and requirements of the Act. Section 40059, subdivision (a), expressly authorizes local entities to determine all

aspects of solid waste handling of local concern, including whether "solid waste handling services" are to be provided by means of exclusive franchise or contract. (§ 40059, subd. (a).)

Definitions governing the construction of section 40059, subdivision (a), are set forth in various provisions of the Act. "Solid waste handling" is defined as "the collection, transportation, storage, transfer, or processing of solid wastes." (§ 40195.) "Processing" is defined as "the reduction, separation, recovery, conversion, or *recycling* of solid waste." (§ 40172, italics added.) "Recycling" is defined as "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products." (§ 40180.) The phrase "segregated from other waste material" is defined as including the "*binding of recyclable material separately from other waste material*" and the "*physical separation of recyclable material from other waste material.*" (§ 40190, subds. (a), (b), italics added.)

Thus, in light of these definitions, under section 40059, subdivision (a), a city may grant exclusively to a solid waste handling enterprise the right of "collection, transportation, storage, transfer, or processing of solid wastes." Because the "processing" of solid wastes includes the "recycling of solid waste," which in turn includes "collecting . . . materials that would otherwise become solid waste, . . ." the Act authorizes a city to grant by exclusive franchise to a single private recycling enterprise the right to provide commercial recycling services within city limits, including the collection and removal of recyclable materials specifically identified in the franchise agreement.

The public benefits of, and municipal purposes served by, an exclusive franchise for *recycling* services are demonstrated by the exclusive franchise agreement in the present case between the City of Rancho Mirage and Waste Management. Under this agreement, *at no additional cost to the city*, Waste Management is required to collect and remove all recyclable materials (as specified and defined therein) that are segregated and placed in separate recycling containers at the curbside on public streets or adjacent to multi-family complexes, or in bins at a location designated by commercial establishments. Waste Management also is required to provide and distribute containers to all residences, and bins to *all* commercial establishments, and must assist homeowners in participating in the curbside recycling program. As compensation for providing recycling services at no additional cost to the

city and its residents, Waste Management is authorized to retain a portion of the revenues generated from the sale of recyclable materials.[3]

The agreement further provides that Waste Management shall develop and implement a public-awareness program to promote and inform the community of the benefits of recycling. Finally, Waste Management is required to submit (to the city) monthly reports of the total tonnage of recyclable materials recovered and sold and the market prices of such materials, as well as yearly status reports designed to facilitate an assessment of the effectiveness of all aspects of the program.

Thus, the exclusive franchise enables and requires Waste Management to provide a comprehensive recycling program throughout the city, offering recycling services to all city residents and commercial establishments, and promoting their participation in the recycling program. The exclusive franchise facilitates the city's coordination and supervision of recycling services within city limits, and provides the city with a helpful method of meeting its obligations under the Act; among other reasons, Waste Management will be motivated strongly to ensure that the city meets its waste diversion and reporting requirements under the Act, in that failure to do so likely would mean a loss of franchise rights.

The exclusive nature of the rights accorded Waste Management under the agreement provides that entity with economic incentive to render the foregoing services and benefits, which it would not have under a nonexclusive arrangement. As explained by Waste Management in support of its application for preliminary injunction, the commercial customers that collect their recyclable materials in large bins generate far greater amounts of recyclable material and can be serviced much more efficiently. For this reason, according to Waste Management, commercial customers "are the key to the economic viability of the recycling program. Enough revenue must be realized from the sale of recyclable material generated by the few large commercial customers to cover the cost of servicing all customers for the program ultimately to succeed."

---

[3]Waste Management is authorized to retain the revenue from the sale of recyclable materials, except (1) in the event the curbside and multifamily recycling programs become "self-sufficient," Waste Management shall share with the city, on an equal basis, any revenue generated by these programs in excess of their cost, and (2) Waste Management is required to credit to each commercial customer a fixed percentage (depending upon the type of recyclable material involved) of the revenue received by Waste Management from the sale of recyclable materials collected from that customer.

The record indicates Palm Springs Recycling seeks to collect only the most commercially desirable recyclable materials, such as glass and cardboard, and to collect such materials only from large commercial establishments. Palm Springs Recycling has demonstrated no interest in the recyclable materials generated by residences and small commercial enterprises. As characterized by Waste Management, Palm Springs Recycling seeks "to skim off the cream of the recycling business," leaving "the less profitable and unprofitable recycling business to [Waste Management] which it is contractually bound to accept." Waste Management maintains that, absent enforcement of its exclusive franchise rights, the comprehensive recycling program is not economically viable.

## IV

The majority concedes the Act authorizes exclusive franchises for solid waste handling services. The majority asserts, however, that "solid waste" as defined under section 40191, subdivision (a), of the Act does not include materials sold by the owner for recycling, because if sold the materials have not been "discarded" within the meaning of the statutory definition of "solid waste." For similar reasons, the majority also maintains that if an owner of property is able to sell that property for recycling purposes, such disposition of the property does not fall within the category of "solid waste handling" that may be covered by an exclusive franchise.

I agree with the majority that the exclusive solid waste collection and recycling rights of an exclusive franchisee such as Waste Management *do not arise* until the owner of the recyclable or nonrecyclable material discards that material for collection by a waste handling service or a commercial recycling enterprise, thus rendering this material a part of the solid waste stream. Thus, the concern of the majority that enforcement of an exclusive franchise for commercial recycling services would interfere with a Boy Scout paper drive, or some other civic or charitable operation, is unfounded. When, however, an owner chooses to dispose of material that previously would have been disposed of as waste, by transferring the property to a commercial recycling enterprise, I believe it is clear that the material has been "discarded" *within the meaning of the Act*, and that the exclusive franchisee has the exclusive right to perform those collection services.

The majority's conclusion, excluding from the ambit of the exclusive franchise arrangement authorized by the Act all material that a property owner chooses to sell for recycling purposes, is not supported either by the

fundamental purpose or the statutory language of the Act. As stated previously, the primary objective of the Act is to encourage and require *integrated*[4] solid waste management, promoting recycling as the preferred waste management option over landfill disposal. To accomplish that goal, the Act establishes, as one of its major components, requirements for significant reductions in the amount of the solid waste disposed of at landfills. As stated, section 41780, subdivision (a), provides, in part, that cities and counties "shall divert 25 percent of all solid waste from landfill" by January 1, 1995, through "recycling . . . activities," and "shall divert 50 percent of all solid waste" by January 1, 2000, through "recycling . . . activities." The Act specifically provides in section 41781 that "(a) . . . for the purpose of determining the base rate of solid waste from which diversion requirements shall be calculated, 'solid waste' includes . . . [¶] (1) The amount of solid waste generated within a local agency's jurisdiction, the types and quantities of which were disposed of at a permitted disposal facility as of January 1, 1990." This provision makes clear that, if a material is of a type and quantity that was disposed of at a permitted disposal facility as of January 1, 1990, the recycling of that material would be considered part of the solid waste stream regulated by the Act. Nothing in the language of the statute suggests that solid waste diverted from landfill disposal through recycling, and thus regulated by the Act, includes only material that has *no* value to the owner or has not been sold by the owner for recycling purposes. Instead, the clear implication of the statutory language of the Act, interpreted as a whole, is that the "solid waste stream" includes material sold for recycling purposes where, but for the availability of recycling, the material otherwise would have been disposed of as landfill.

Moreover, one of the primary purposes of the Act is to encourage more efficient methods of recycling, as well as the creation of markets for recycled materials (i.e., to make recyclable materials more commercially marketable). In light of this objective, it would be anomalous to interpret the Act as excluding a particular recyclable material from a city's integrated waste management program simply because, through technology encouraged by the Act, the recycling process for that particular material has become economically viable. Indeed, it may well be impossible for municipalities to further the Act's objectives and meet the Act's very substantial waste-diversion requirements if, as newer and more efficient recycling processes are developed and additional markets are created, municipalities cannot count, as part of the quantum of solid waste satisfying the waste-diversion requirements, those materials that, because of their recyclable potential, have achieved some commercial value to the owner. Correspondingly, if recyclable material sold by its owner for recycling purposes cannot be counted

---

[4]See footnote 2, *ante.*

under section 41780 as waste diverted from disposal through recycling, municipalities may have little incentive to encourage either new forms of recycling, or markets for recyclable materials.

Furthermore, if the recycling of material that has commercial value, and that may be sold by the owner, is not part of solid waste handling regulated by the Act, exclusive franchises for specified recycling services frequently may no longer be economically viable for the exclusive franchisee, thereby diminishing a municipality's ability to effectuate a comprehensive citywide recycling program such as that provided by Waste Management under the exclusive franchise agreement at issue. Under the majority's interpretation of the Act, a municipality would have no authority to prevent a competing commercial recycling enterprise such as Palm Springs Recycling from "skimming off the cream" of the recycling business, leaving many of the municipality's residents without an economically viable recycling program.[5]

Finally, courts long have rejected the notion that the owner of waste material having some market value has an interest in that material superior to the police power to protect the public health and safety. (See *California Reduction Company* v. *Sanitary Reduction Works, supra,* 199 U.S. 306; *Gardner* v. *Michigan, supra,* 199 U.S. 325; *In re Pedrosian* (1932) 124 Cal.App. 692 [13 P.2d 389]; *Ex parte Santos* (1928) 88 Cal.App. 691 [264 P. 281].) More recently, the Sixth Circuit in *Hybud Equipment Corp.* v. *City of Akron, Ohio, supra,* 654 F.2d 1182, reached a similar conclusion in the context of recycling. In that case, the Court of Appeals upheld an ordinance

---

[5]Although the majority does not rely upon section 41952 in support of its holding, the Court of Appeal construed that provision as authorizing owners of recyclable materials to contract with a recycling enterprise of their choice for the collection of these materials, notwithstanding the existence of an exclusive franchise granted by the local governing entity. I conclude the Court of Appeal misconstrued the scope of section 41952. That statute appears in chapter 9 of part 2 of division 30 of the Public Resources Code (§ 41950 et seq.), entitled "Unlawful Acts." The provisions of chapter 9 proscribe, among other actions, the unauthorized removal of recyclable materials from receptacles maintained for their collection. This provision relied upon by the Court of Appeal clarifies that chapter 9, proscribing "unlawful acts," does not *in and of itself* (1) require the owner of recyclable materials to dispose of them in curbside receptacles, (2) subject the owner of such recyclable materials to civil penalties for retrieval of an item previously placed in its own receptacle, or (3) otherwise restrict the owner's ability to sell or dispose of such materials.

By its express terms, however, section 41952 pertains solely to chapter 9. Although nothing in chapter 9 restricts the disposal of recyclable materials by the owner, as explained above, section 40059, subdivision (a), contained in a different part and chapter of the Act, *does* authorize a city to regulate commercial recycling services within city limits by exclusive franchise, and thereby to restrict the manner of collection and disposal of recyclable material by commercial entities. In view of its language, context, and purpose, section 41952 cannot reasonably be interpreted as repealing the authority of a local entity (to enter into exclusive franchises) explicitly conferred by section 40059, subdivision (a).

of the City of Akron requiring that all solid waste be delivered to the City's "waste to energy" facility. Rejecting the claim that recyclable material had become more valuable in modern times and that the older case law relating to the municipal police power to regulate waste therefore no longer was applicable, the court held: "The old cases are not anachronisms. They are not distinguishable on any of these grounds. The solid waste disposal problem is as serious today for cities as in the past, perhaps more serious." (*Id.*, at p. 1193.)

## V

The provisions of the Act authorizing a municipality to establish an exclusive franchise for the recycling of material, even if the material is of the type that has a market value because of its potential for recycling, do not permit a municipality to require that the owner of such property dispose of it through the exclusive franchisee without receiving just compensation for such recyclable material. The just compensation rights of property owners, however, is not an issue presented by this case, because no property owner is a party to this action. Instead, the sole issue before us is whether a competing recycling company possesses the right to operate in violation of an exclusive franchise agreement (for recycling services) authorized by state law.

Moreover, it is important to note that *any* exclusive franchise for waste handling services will impinge to some extent upon the economic interests of property owners. Even when dealing with waste having *no* market value, an exclusive franchise for its collection and disposal may require that some residents pay rates for waste handling services higher than these particular residents might have been able to negotiate with a private enterprise other than the exclusive franchisee. As discussed previously, however, past cases repeatedly have affirmed the authority of municipalities to enter into exclusive franchises that limit the authority of individual residents to dispose of their waste, because of the general societal benefits afforded by an exclusive franchise—for example, the assurance that *all* persons and businesses within a community will be served at reasonable rates, without regard to their individual circumstances, and the reduction of the municipality's burden of supervising the safe delivery of these services.

## VI

For the foregoing reasons, I believe that the city's grant of an exclusive franchise to Waste Management for solid waste handling services within city limits, including the recycling services described in the exclusive franchise agreement, was authorized by the Act. Therefore, I would reverse the

judgment of the Court of Appeal and remand the case to that court with directions to affirm the judgment entered by the trial court.

Mosk, J., concurred.