**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

DANIEL J. MILLIS,
        *Defendant-Appellant.*

No. 09-10134

D.C. No.
4:08-CR-01211-CKJ

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
March 2, 2010—Las Vegas, Nevada

Filed September 2, 2010

Before: Sidney R. Thomas, M. Margaret McKeown, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Sidney R. Thomas;
Dissent by Judge Bybee

---

**COUNSEL**

William G. Walker, Tucson, Arizona, for the appellant.

Ann L. DeMarais, Tucson, Arizona, for the appellee.

---

**OPINION**

THOMAS, Circuit Judge:

Daniel Millis challenges his conviction under 50 C.F.R. § 27.94(a) for placing full, gallon-sized plastic bottles of water on trails in the Buenos Aires National Wildlife Refuge to help alleviate exposure deaths among undocumented immigrants crossing into the United States. Millis concedes that he placed water on refuge trails, but argues that his actions did

not violate § 27.94(a). We have jurisdiction under 28 U.S.C. § 1291 and reverse Millis's conviction.

I

On February 22, 2008, United States Fish and Wildlife Service Officers Allen Kirkpatrick and Scott Kozma observed four individuals in a Toyota 4Runner while patrolling in the Buenos Aires National Wildlife Refuge. As Kirkpatrick approached the vehicle, he noticed several gallon-sized plastic bottles of water through the lowered back window; the back window was then remotely raised.

In the 4Runner were Daniel Millis and three other volunteers from "No More Deaths," an organization that provides humanitarian aid to migrants. One such service is the placement of water in the desert along frequently traveled routes for unlawful entrants into the United States. Millis, the driver of the 4Runner, later testified that he had placed water on the refuge on at least several dozen occasions. He also testified that he had raised the back window when Kirkpatrick approached to make visible his "NoMoreDeaths.org" decal.

Upon questioning, Millis admitted that the volunteers had been placing plastic bottles of water on refuge trails, but indicated that they had also picked up discarded empty bottles. Kirkpatrick responded that the group's actions constituted littering and requested that the group retrieve the bottles. Kirkpatrick later testified that litter problems had placed the refuge on a list of the ten most imperiled national wildlife refuges in the country. According to his testimony, the refuge remains the last habitat in the United States for the masked bobwhite quail and houses other endangered plant and animal species.

Kirkpatrick also informed Millis that special permits were required to leave water on the refuge and that a permit application to place gallon-sized plastic bottles of water on the refuge would be denied. According to his testimony, refuge

managers had granted another organization, Humane Borders, a special use permit to keep large water drums on the refuge. One of these drums was located less than two miles away. Also in close proximity was a United States Border Patrol rescue beacon.

After the volunteers retrieved three bottles of water on a nearby trail, the officers drove off in an eastbound direction on Brown Canyon Road. Soon, Kirkpatrick noticed fresh tire marks on the side of the road alongside another trail and suspected the volunteers had left bottles in that area as well. Kirkpatrick exited the car to recover the bottles and instructed Kozma to stop the 4Runner if it passed, which he did. The witnesses gave differing accounts of the conversation that followed. Kozma testified that he told the volunteers to meet him on the next trail where they had placed water. Millis testified that Kozma told the volunteers to meet him on the next trail where they had placed water that would be easy to retrieve.

The officers again drove eastbound on Brown Canyon Road, expecting to meet the volunteers at the next trail that had bottles of water. They noticed fresh tracks and stopped and recovered bottles from the next two trails. However, the volunteers did not stop. Believing that the volunteers had not complied with their instructions and were leaving the refuge, the officers decided to locate them and issue a citation.

The officers encountered the 4Runner and its occupants for the third time further east on Brown Canyon Road. Millis and the three passengers were standing outside the 4Runner. Millis testified that they had picked up several bottles at this location and believed themselves to have complied with Kozma's instructions.

The officers disagreed. Kirkpatrick issued Millis a citation for "Disposal of Waste" on a national wildlife refuge, as a first offense, in violation of 50 C.F.R. § 27.94(a) and asked Millis for the location of any remaining plastic bottles of

water. Millis produced a notebook that detailed the volunteers' water drop route. The notebook included GPS coordinates for each drop off spot and a numbering system. The numbers listed in the notebook corresponded to numbers written on the bottles alongside the date "2/22/08." In total, officers retrieved seventeen bottles of water from refuge trails and seized several more from the back of the 4Runner, for a total of twenty-five.

At his bench trial, Millis admitted that he had placed the bottles of water on the refuge. However, he testified that leaving water out for illegal immigrants constitutes humanitarian aide and that "humanitarian aide is never a crime."

The magistrate judge found Millis guilty of the charge and imposed a suspended sentence. Millis appealed to the district court, contending that the placement of bottles of purified water on a national wildlife refuge does not violate § 27.94(a) as a matter of law. The district court affirmed Millis's conviction.

## II

**[1]** We review questions of law de novo. *United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc). The regulation under which Millis was convicted, 50 C.F.R. § 27.94, is entitled "Disposal of Waste" and provides that:

> (a) The littering, disposing, or dumping in any manner of garbage, refuse sewage,[1] sludge, earth, rocks, or other debris on any national wildlife refuge except at points or locations designated by the refuge manager, or the draining or dumping of oil, acids, pesticide wastes, poisons, or any other types of chemical wastes in, or otherwise polluting any waters, water

---

[1]The term "refuse sewage" is not separated by a comma. *See* 41 Fed. Reg. 9166, 9171 (March 3, 1976).

holes, streams or other areas within any national wildlife refuge is prohibited.

(b) Persons using a national wildlife refuge shall comply with the sanitary requirement established under the provisions of this Subchapter C for each individual refuge; the sanitation provisions which may be included in leases, agreements, or use permits, and all applicable Federal and States laws.

Millis concedes that he placed water on refuge trails, but argues that his conduct did not violate § 27.94(a) because the bottles of purified water did not constitute "garbage, refuse sewage, sludge, earth, rocks, or other debris" within the meaning of the regulation. The United States counters that the bottles constitute "garbage."**²**

**[2]** We begin by noting that the rule of lenity "requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government." *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006); *see also United States v. Miranda-Lopez*, 532 F.3d 1034, 1040 (9th Cir. 2008). The rule of lenity applies "only where 'after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute.' " *United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008) *(quoting Smith v. United States*, 508 U.S. 223, 239 (1993)). In such a case, fundamental principles of due process mandate that "no individual be forced to speculate, at peril of indictment,

---

**²**We would have no problem affirming Millis's conviction if, as the dissent contends, § 27.94 prohibited " 'littering' in a wildlife refuge or disposing of or dumping 'garbage, refuse sewage, sludge, earth, rocks, or other debris.' " However, that is not the text of the regulation. Rather than generally prohibiting littering, § 27.94 governs "Disposal of Waste." In subsection (b), it requires compliance with applicable "sanitation provisions." In subsection (a), it prohibits specifically the 'littering . . . of garbage, refuse sewage, sludge, earth, rocks, or other debris."

whether his conduct is prohibited." *Nader*, 542 F.3d at 721 (citation and internal quotation marks omitted).

**[3]** We next turn to the language of the regulation. When construing a word, we generally construe the term in accordance with its " 'ordinary, contemporary, common meaning.' " *Cleveland v. City of L.A.*, 420 F.3d 981, 989 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). To that end, we may consider a dictionary definition. *See id.*; *see also Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, ___ U.S. ___, 2010 WL 693684, *5 (2010) (using dictionary definitions to inform statutory construction of words). Webster defines "garbage" as "food waste" or "discarded or useless material." Webster's Collegiate Dictionary 480 (10th ed. 1996).[3] "Discard," in turn is defined as "1: to get rid of, esp. as useless or unpleasant." *Id.* at 330. Applying those definitions in the present context, the text of § 27.94(a) is ambiguous as to whether purified water in a sealed bottle intended for human consumption meets the definition of "garbage."[4,5]

---

[3]Other dictionaries are in accord. *See, e.g.*, Random House Webster's Collegiate Dictionary 540 (2000) (defining "garbage" as "1. discarded animal and vegetable matter, as from a kitchen. 2. any matter that is no longer wanted or needed; trash. 3. anything that is contemptibly worthless, inferior, or vile"); Oxford English Dictionary, vol. 6, at 363-64 (2d ed. 2001) (defining garbage as "2. Refuse in general; filth").

[4]The Supreme Court's decision in *United States v. Standard Oil Co.*, 384 U.S. 224 (1966), does not compel a different result. At issue in *Standard Oil* was a "broad and inclusive" statute prohibiting the depositing in a body of water of "any refuse matter of any kind or description whatever." *Id.* at 229. In deciding the case, the Supreme Court observed that "[m]ore comprehensive language would be difficult to select." *Id.* The regulation at issue here is decidedly more narrow.

[5]Nor do we, contrary to the assertion of the dissent, settle upon a definition of "garbage" that turns on an item's value, rather than whether it was discarded. Under either interpretation, application of the regulation to Millis's conduct involves significant ambiguity. *See, e.g.*, *Waste Mgmt. of the Desert, Inc. v. Palm Springs Recycling Ctr., Inc.*, 869 P.2d 440, 442-43 (Cal. 1994) (considering the notion of value in construing the term "discarded" to interpret California's Waste Management Act) (citations omitted).

**[4]** A second fundamental canon of construction is that words must be read in their context, with a view to their place in the overall regulatory scheme, and to " 'fit, if possible, all parts into an harmonious whole.' " *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)). There is little doubt that the overarching purpose of the underlying statute and implementing regulations is the conservation, management, and restoration of wildlife and natural habitats. Pursuant to the 1997 Refuge Improvement Act:

> The mission of the [National Wildlife Refuge] System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans.

16 U.S.C. § 668dd(a)(2). In administering the System, the Secretary is instructed to "ensure that the mission of the System . . . and the purposes of each refuge are carried out," *id*. at § 668dd(a)(4)(D); "plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System," *id*. at § 668dd(a)(4)(C); and to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans," *id*. at § 668dd(a)(4)(B). Additional uses of System areas are permitted only if the Secretary of the Interior "determines that such uses are compatible with the major purposes for which such areas were established." *Id.* at § 668dd(d)(1)(A); *see also* 50 C.F.R. § 26.41. As the district court correctly noted, therefore, the intent of the regulatory scheme is to prevent the disposal or abandonment of unauthorized property on refuge land.

**[5]** However, the structure of the regulatory scheme achieves that end in a number of ways. Section 27.94(a), as

we have noted, forbids the "littering, disposing, or dumping in any manner of garbage, refuse sewage, sludge, earth, rocks, or other debris." Another provision prohibits "[a]bandoning, discarding, or otherwise leaving any personal property in any national wildlife refuge." 50 C.F.R. § 27.93. A third provision anticipates that some property might be placed in the refuge upon receipt of a special use permit. 50 C.F.R. § 25.41; *see also* 50 C.F.R. § 25.42 (requiring the exhibition of permits upon request). The structure of the regulatory scheme thus suggests that § 27.94(a) was not intended to be a comprehensive implementation of the Congressional mandate to minimize human impact on wildlife refuges; rather, it formed part of a larger regulatory scheme.[6] Indeed, as the government concedes, special use permits have been granted to allow the placement of water drums within the refuge for humanitarian purposes.

**[6]** The narrow question we consider today is whether the term "garbage" within the context of the regulation was sufficiently ambiguous that the rule of lenity would apply in this case. Here, given the common meaning of the term "garbage," coupled with the regulatory structure, we conclude that § 27.94(a) is sufficiently ambiguous in this context that the rule of lenity should apply. Millis likely could have been charged under a different regulatory section, such as abandonment of property or failure to obtain a special use permit. However, that is not the question presented here. The only question is whether the rule of lenity should be applied to the offense charged. We conclude that it does apply, and we reverse the judgment of the district court.

**REVERSED.**

---

[6]Thus, we do not hold that "any number of objects (for example, sleeping bags, packaged food, clothing, flashlights, plastic bags, or shoes) can be left in the wildlife refuge." The abandonment of such items may well be prohibited by other regulations applicable to refuge lands, including 50 C.F.R. § 27.93, § 25.41, and § 25.42.

BYBEE, Circuit Judge, dissenting:

Daniel Millis, motivated by humanitarian concerns, scattered plastic gallon-size water bottles with bright blue caps throughout the Buenos Aires National Wildlife Refuge in southern Arizona. When Millis failed to pick up all of the bottles after Fish and Wildlife Service employees asked him to do so, he was cited for littering on a national wildlife refuge. 50 C.F.R. § 27.94(a). After a bench trial, a magistrate judge found Millis guilty of the charge, and the district court affirmed his conviction. The majority overturns his conviction on the grounds that the common meaning of the term "garbage" is "sufficiently ambiguous" to require invocation of the rule of lenity. I believe that the rule of lenity does not apply here because leaving plastic bottles in a wildlife refuge is littering under any ordinary, common meaning of the word.

I

The Buenos Aires National Wildlife Refuge is located in Arizona on the border between the United States and Mexico. In 1985, the Fish and Wildlife Service ("the Service") purchased the area in order to restore the area's grasslands and to protect endangered animals such as the pronghorn and the masked bobwhite quail. U.S. Fish & Wildlife Service, Buenos Aires National Wildlife Refuge, http://www.fws.gov/southwest/refuges/arizona/buenosaires/history.html (last visited Aug. 5, 2010). Among other things, under the Refuge Improvement Act, 16 U.S.C. § 668dd(a)(4), the Service must (1) "provide for the conservation of fish, wildlife, and plants, and their habitats"; (2) "ensure that . . . the environmental health of the System [is] maintained"; (3) "contribute to the conservation of the ecosystems"; and (4) "ensure that the mission of the System . . . and the purposes of each refuge are carried out." 16 U.S.C. § 668dd(a)(4)(A), (B), (C), (D). The Refuge Act also states that "[n]o person shall disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States, including natural growth, in any

[refuge]; or . . . enter, use, or otherwise occupy any such area for any purpose; unless such activities are performed by persons authorized" to do so. *Id.* § 668dd(c). In furtherance of this prohibition, the Service issued a regulation prohibiting anyone from "littering, disposing, or dumping in any manner of garbage, refuse sewage, sludge, earth, rocks or other debris on any national wildlife refuge." 50 C.F.R. § 27.94(a).

In my view, the regulation readily encompasses the act of scattering water bottles in a wildlife refuge. Although the regulation is poorly drafted, it can be understood by persons of ordinary intelligence. The regulation forbids "littering" in the wildlife refuge or disposing of or dumping "garbage, refuse sewage, sludge, earth, rocks, or other debris."[1] *Id.* § 27.94(a). I see no need to invoke the rule of lenity.

The rule of lenity is founded on the policy that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Bass*, 404 U.S. 336, 348 (1971). We use the rule to aid us in interpreting an ambiguous statute by resolving doubt in favor of the defendant. *See id.* at 348-49. The rule of lenity only applies "when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *United States v. Hayes*, 129 S. Ct. 1079, 1089 (2009). "The simple existence of some statutory ambiguity . . . is not sufficient to warrant application of th[e]

---

[1]The regulation suffers from several grammatical challenges. The regulation begins with three gerunds listed in series—"littering, disposing, or dumping"—followed by an object introduced by a preposition—"of garbage, refuse sewage, sludge, earth, rocks or other debris." 50 C.F.R. § 27.94(a). "Littering," however, does not really match the phrase that follows—it makes little sense to say "the littering . . . of garbage, refuse sewage, sludge, earth, rocks, or other debris." We don't ordinarily think of littering in terms of sewage, sludge, or rocks. Moreover, the "of" before "garbage" doesn't make sense; neither "littering" nor "dumping" requires it. The regulation was probably intended to read: "[L]ittering, or disposing of or dumping garbage, refuse sewage, [etc.] . . . is prohibited."

rule [of lenity], for most statutes are ambiguous to some degree. . . . To invoke the rule, we must conclude that there is a grievous ambiguity or uncertainty in the statute," such that "after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (quotation marks, omission, and citations omitted).

Largely ignoring the term "littering," the majority focuses instead on the term "garbage," which it defines as "food waste" or "discarded or useless material" Maj. Op. at 13296. The majority concludes that because the water in the bottles is "intended for human consumption," the bottles have value, and, therefore, are not garbage. Maj. Op. at 13296. The majority holds that "given the common meaning of the term 'garbage,' . . . § 27.94(a) is sufficiently ambiguous in this context that the rule of lenity should apply." Maj. Op. at 13298.

I think the critical term here is not "garbage," but "littering." Millis's citation was not for dumping garbage but for "littering in a National Wildlife Refuge." Millis testified that wildlife refuge workers told them that leaving "water jugs on that trail . . . constituted litter," and that he was "going to be cited for littering." Officer Kirkpatrick similarly testified:

> I told [Millis] that placing water out on the refuge was littering. I explained to him that under the National Wildlife System Administration Act that was a class B misdemeanor and he could face up to six months in jail and/or five thousand dollars in fines for littering on a national wildlife refuge.

After Mills and those with him failed to pick up the jugs they had deposited, Officer Kirkpatrick "explained to them that [he] was going to cite them for littering at that point because [he] felt they had no intention of complying with [the Service's] regulations." Littering is not the same thing as dumping garbage. The two terms are sometimes used

interchangeably, but (as long as we are using dictionaries) "littering" means "to strew with scattered articles," and the example cited refers to one who "litters the scene with papers, boxes, [and cans.]" WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1322 (2003). Such items may constitute garbage, but strewing an area with papers, boxes, and cans may be evidence of mere untidiness or, more appropriately here, items that—in context—are valuable to someone, but not to the person or entity controlling the area.

The First Amendment handbill cases supply a good example. We have struck down regulations that prohibited soliciting or leafleting in public fora on First Amendment grounds, despite the government's position that such regulations were aimed at preventing littering. *See Schneider v. State*, 308 U.S. 147 (1939); *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir. 1998). But we have never questioned the legitimacy of the government's position that discarded leaflets were litter, no matter their potential First Amendment value. As the Supreme Court stated in *Schneider*, "the guarantee of freedom of speech . . . [does not] deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. . . . There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." *Schneider*, 308 U.S. at 150-51. Similarly, we observed in *S.O.C.* that "[c]ities and counties have a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter," but found that this interest could not curb the protected activity of handing out pamphlets in public fora. *S.O.C.*, 152 F.3d at 1146. The entity controlling the public forum has the authority to determine what constitutes litter, no matter its potential use to anyone else. *See City of Fredonia v. Chanute Tribune*, 638 P.2d 347, 351 (Kan. Ct. App. 1981) (conviction for littering after a shopper paper was thrown on the lawn of a resident who had notified the paper he did not want to receive it: "Insofar as the complaining witness was concerned, however, the paper was worthless to him and when thrown on his lawn contrary to his

expressed desire, it constituted 'paper' and 'litter' which he was compelled to dispose of."). Likewise, the Service has the authority to determine what items, strewn in the underbrush of the wildlife refuge, are litter.

There is nothing remotely ambiguous about a regulation prohibiting littering in a wildlife refuge. Any item—whether a handbill advertising a land auction or a new high definition TV—brought into the wildlife refuge without the Service's permission is litter, whether it has intrinsic value or not. It doesn't belong on the wildlife refuge. The Service couldn't have been more clear on this. There are no refuse containers on the wildlife refuge. Visitors to the area must abide by a familiar "pack in, pack out" policy, meaning that the Service expects visitors to pack out all of their personal belongings, including trash, when they leave the area. *See* Public Use Regulations: Buenos Aires National Wildlife Refuge, http://www.fws.gov/southwest/refuges/arizona/buenosaires/ PDFs/Regulations%20Flyer2006.pdf (last visited Aug. 5, 2010).

The anti-littering regulation applies whether the items were deposited intentionally or left inadvertently. Millis was intentionally depositing water jugs on trails in the wildlife refuge for illegal immigrants crossing into Arizona who were ill-prepared for the rigors of a desert crossing. But it wouldn't matter if the items were really nice sleeping bags forgotten by the inattentive scouts of Troop 101. In the context of the wildlife refuge, plastic water bottles and sleeping bags are litter and inconsistent with conservation in the Buenos Aires National Wildlife Refuge.

II

Even if I thought that the key regulatory term was "garbage," I would find the majority's application of the dictionary definition to be problematic. The majority defines garbage as "discarded or useless material," Maj. Op. at 13296,

but it focuses only on whether the bottles are "useless material." The idea that garbage is "discarded," however, comports with the everyday, common meaning of the term "garbage" and is essential to its definition because it avoids a purely subjective inquiry into the material's usefulness.[2] When Millis abandoned the water bottles in the wildlife refuge, he "discarded" the bottles according to the ordinary, everyday meaning of the word. The bottles are garbage because they are "discarded material," no matter the bottles' potential value.

The Supreme Court analyzed whether material with value could be considered "refuse" in *United States v. Standard Oil Co.*, 384 U.S. 224 (1966). In *Standard Oil*, the government prosecuted the company for accidently discharging oil into a river under a statute that prohibited depositing "any refuse matter of any kind or description" in a body of water. *Id.* at 225. The district court dismissed the indictment, reasoning that because the oil was valuable it could not be considered "refuse material" under the statute. The Supreme Court rejected the "narrow, cramped reading" of the term "refuse material" by the district court, and defined "refuse" as "anything which has become waste, however useful it may earlier have been." *Id.* at 226, 229. The Court concluded, "[o]il is oil and whether useable or not by industrial standards it has the

---

[2]Two courts that have had the occasion to define "garbage" or "waste" in a statute have emphasized the concept of the item being "discarded" over the item's value. In *Waste Management Of the Desert, Inc. v. Palm Springs Recycling Center, Inc.*, 869 P.2d 440 (Cal. 1994), the California Supreme Court interpreted "waste" for the purposes of the California Integrated Waste Management Act of 1989 and held that "property is not 'waste' until it is discarded." *Id.* at 442. In *Northern Illinois Service Company v. EPA*, 885 N.E.2d 447 (Ill. App. Ct. 2008), the Illinois court found that uprooted, dead trees were within the definition of litter under the Illinois Environmental Protection Act. The Act prohibited "the open dumping of any waste in a manner" that results in "litter," and defined waste as "any garbage . . . or other discarded material." Using this definition, the court found that even though the trees had market value they were "other discarded material" under the Act and observed that "[w]hether an item has value has no bearing on whether it is discarded." *Id.* at 452.

same deleterious effect on waterways . . . There is nothing more deserving of the label 'refuse' than oil spilled into a river. That seems to us to be the common sense of the matter. The word 'refuse' includes all foreign substances and pollutants." *Id.* at 226, 229-30. Similarly, "the common sense of the matter" here is that the bottles are "foreign substances and pollutants" in an area devoted to the conservation of habitats and the protection of delicate ecosystems. Once Millis abandoned the bottles in the wildlife refuge, they became garbage "whether useable or not" because the bottles were "deleterious" to the wildlife refuge.[3] *Id.* at 226.

The majority suggests that the bottles are not garbage because the water in the bottles was "intended for human consumption." Maj. Op. at 13296 (emphasis added). But whether an item is "intended" to be useful is not a valid basis for determining whether the item is in fact useful.[4] Under the majority's definition, any number of objects (for example, sleeping bags, packaged food, clothing, flashlights, plastic bags, or shoes) can be left in the wildlife refuge without incurring liability under § 27.94(a) merely because someone

---

[3]If the Service did nothing to prevent the wildlife refuge from turning into an informal Goodwill donation center, it could be liable for failing to comply with the Refuge Act's statutory requirement to protect the habitat, environmental health, and ecosystem of the area. *See* 16 U.S.C. § 668dd.

[4]Millis's intent, as benevolent as it may have been, is irrelevant to the validity of his conviction. He was convicted under a portion of the Refuge Act that does not require any proof of the defendant's intent to violate the littering regulation. Penalties under the Refuge Act are divided into two groups. Any person who "knowingly" violates the Act, or a regulation promulgated under the Act, is fined or imprisoned for up to a year or both. 16 U.S.C. § 668dd(f)(1). "Any person who otherwise violates" the regulation, or who, for example, violates the regulation unknowingly, is fined or imprisoned for up to 180 days or both. *Id.* § 668dd(f)(2). Millis was convicted for "otherwise violat[ing]" the littering regulation. Even if he did not think that the bottles were garbage or that he was littering, he could still be convicted of violating the regulation under the Act. There was no need to prove that he intended to litter in the wildlife refuge or that he intended the bottles to be garbage.

thought that the discarded item might be useful to the next person passing through.[5] Even if we focus on the term "garbage," there is nothing particularly ambiguous about the meaning of the regulation.

## III

Even if I thought there was some wiggle room in understanding the common words "littering" and "garbage," the majority has not properly applied the rule of lenity as a method of statutory construction. The rule of lenity is an aid to interpreting "grievously ambiguous" statutes and requires a court to resolve doubt in favor of the defendant. *Dean v. United States*, 129 S. Ct. 1849, 1856 (2009). It does not allow the court to merely reverse the conviction without offering some workable interpretation of the ambiguous term or statute. Here, the majority simply concludes, "[t]he only question is whether the rule of lenity should be applied to the offense charged. We conclude that it does apply, and we reverse the judgment of the district court." Maj. Op. at 13298. Instead of interpreting the Service's regulation in a way favorable to Millis, the majority simply concludes that the regulation is ambiguous—presumably because the bottles were intended for human consumption—and overturns the conviction. In doing so, the majority treats the regulation as if Millis had challenged it under the Due Process Clause as an unconstitutionally vague regulation.[6]

---

[5]At trial, Officer Kirkpatrick testified that "there was a great deal of trash on the refuge," which consisted of "water bottles, backpacks, . . . articles of clothing, foodstuffs, vehicles," and "pretty much anything you can imagine."

[6]States have summarily dismissed the argument that the terms "litter," "garbage," "waste," or "refuse" are too vague to pass constitutional muster. *See, e.g., State v. Couch*, 288 Wis.2d 659, 659 (Wis. Ct. App. 2005) (holding that ceramic objects were "solid waste" and the littering statute was not unconstitutionally vague); *State v. Cox*, 1993 WL 65457 at *1(Ohio. Ct. App. 1993) (holding that the definition of litter as "garbage, trash, waste, or rubbish . . ." was not unreasonably vague); *Sliney v. State*,

The rule of lenity "induce[s] Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008). But the majority would have the Service avoid using a term as common as "garbage" in its littering regulation. This is not what the rule of lenity requires. The rule of lenity "cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term." *Taylor v. United States*, 495 U.S. 575, 596 (1990). Here, the rule of lenity doesn't lead to any interpretation at all.

In my view, both the Service and Congress have spoken clearly: Congress prohibited anyone from disturbing wildlife refuge land in any manner and doing any activity without authorization from the Service, *see* 16 U.S.C. § 668dd(c); in response, the Service promulgated a regulation that prohibited littering, disposing of, or dumping garbage in any manner in a wildlife refuge, *see* 50 C.F.R. § 27.94(a). Section 27.94(a) provides "a fair warning. . . in language that the common world will understand," *Bass*, 404 U.S. at 348, that littering plastic bottles throughout a wildlife refuge is prohibited.

\* \* \* \* \*

I would hold that Millis "litter[ed] . . . on [a] national wildlife refuge," 50 C.F.R. § 27.94(a), and would affirm his conviction. I respectfully dissent.

---

391 S.E.2d 114, 115 (Ga. 1990) (holding that the terms "waste," "litter," and "garbage" in a statute forbidding the removal of refuse from a refuse container were not unconstitutionally vague); *State v. Clayton*, 492 So.2d 665, 666-67 (Ala. Crim. App. 1986) (holding that a statute using the term "solid waste" was not vague, ambiguous, or unenforceable); *State v. Hood*, 600 P.2d 636, 639 (Wash. Ct. App. 1979) (holding that a statute that prohibited people from "dispos[ing] of litter" was not unconstitutionally vague).